224 N.J. Super. 515 (1988)
540 A.2d 1324
PATRICIA BLUVIAS, EDWARD BLUVIAS, KAREN MILLER AND GLENN MILLER, PLAINTIFFS-APPELLANTS,
v.
WINFIELD MUTUAL HOUSING CORPORATION, DEFENDANT-RESPONDENT.
WINFIELD MUTUAL HOUSING CORPORATION, PLAINTIFF-RESPONDENT,
v.
JOSEPH BUTCHKO, ROCCO GERVASI AND BRIAN MORAN AND SHARON MORAN, HIS WIFE, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued March 7, 1988.
Decided April 13, 1988.
*517 Before Judges DREIER, BAIME and ASHBEY.
Robert F. Cox argued the cause for appellants Bluvias and Miller (McCreedy & Cox, attorneys; Robert F. Cox, on the brief).
Morton P. Weitzman argued the cause for appellants Butchko, Gervasi and Moran (Morton P. Weitzman, attorney).
Walter R. Cohn argued the cause for respondent (Cohn & Cohn, attorneys; Charles R. Cohen, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
Plaintiffs Bluvias and Miller and defendants Butchko, Gervasi and Moran in these consolidated cases have appealed from judgments in favor of Winfield Mutual Housing Corporation determining that the individuals have violated their agreements with defendant and thus must forfeit their rights to perpetual occupancy of their dwellings in Winfield Park. For the sake of *518 convenience the residents will be referred to as plaintiffs and the Housing Corporation as defendant.
Winfield Park is a unique entity. It is a municipality duly incorporated as a township, but the entire area of the Township, with one minor exception, is owned by defendant, Winfield Mutual Housing Corporation. The sole exception is the street area which was ceded to the Township by the Corporation in order to obtain State road aid. The municipal building, school, shopping area and all of the dwelling units in the Municipality are owned by the Corporation.[1]
During the Second World War defendant leased the housing project from the federal government, the lease containing a favorable option to purchase. In late 1950 the Corporation exercised the option, and the entire project was sold to the Corporation for $1,358,567.21, secured by a mortgage on the project. The mortgage instrument imposed rigorous conditions upon membership in the Corporation and the terms of occupancy. Insofar as the terms are pertinent to this case, the mortgage required that the members of the Corporation execute mutual ownership contracts as evidence of their rights to "perpetual use in a dwelling unit" in the project and imposed restrictions on becoming a "member" of the Corporation. Consequently both the by-laws of the Corporation and the mutual ownership contract provide that a signatory member must occupy the dwelling unit. The member cannot sublease his *519 units except with the Corporation's express permission, and if a member surrenders his certificate and ceases to occupy the dwelling unit, the Corporation has the right of first refusal to purchase the unit for a set amount, currently $2,500. This is the approximate price that past and current members have paid for their units. In addition, members are assessed monthly maintenance charges at an extremely low rate, currently under $250.
The principal disputed restriction involves the Corporation's method of selecting new members. The restrictions are applied when a unit becomes vacant. It is theoretically possible that the Corporation would not exercise its right of first refusal to repurchase the unit for $2,500. Given the cost of alternative housing, however, it is highly unlikely that the Corporation would forego this valuable right. The Corporation therefore historically is the sole transferee of any unit, and it reassigns the unit according to a specific priority list, to wit:
1. Current members displaced by fire;
2. Current members who vacate to serve in the armed forces;
3. Current members who wish to transfer to a different unit;
4. Sons and daughters of current members who have served in the armed forces;
5. Sons and daughters of current members;
6. Parents of current members; and
7. Brothers and sisters of current members.[2]
In August 1984 the Corporation paid off the balance of the federal mortgage. The transfer restrictions imposed in the mortgage were therefore no longer mandatory, and the members of the Corporation met to determine whether they would continue the restrictions. They chose overwhelmingly to do so. Specifically, they rejected a proposal which would have permitted *520 a member to sell or give his dwelling unit to anyone other than the Corporation.
Plaintiffs here all are members of the Corporation who desire to transfer their units to other members of their family or, in one case, to a member of the public. They claim that the Corporation's right of first refusal coupled with its restrictive reissuance policy is an undue restriction on plaintiffs' right of alienation. Further, they claim that the Corporation is little more than a "company town," and that the corporate action constitutes illegal discrimination.
Initially, we must determine the nature of the Corporation. The actions of the Corporation could be thought of as State action under the principles established in Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), since the Company owns all of the land within the municipality, it controls who may be a member of the Corporation, and it provides many services usually reserved to government. The Corporation is governed by a Board of Trustees elected by the members. The Municipality, however, is governed by a separate three-member Township Committee authorized by a special statute, P.L. 1942, c. 194. The Township Committee is, of course, elected by all registered voters of the Municipality 18 years of age or older. The citizens are a larger class than the certificate holders, since the class includes voters who are children and other friends or relatives residing in the units with the certificate holders. The Municipal government provides police and fire protection and a municipal court; the Corporation provides sewer service, water service, street cleaning, snow removal and the like. However, these latter services are often provided by the management of large housing developments and are not necessarily an indication of the exercise of municipal powers.
Since all municipal regulation is exercised by an authority established by the voters of a community, and here all powers usually devolving upon a municipality are exercised by the *521 Township, we cannot find on these facts that Winfield is a "company" town under the definition of Marsh v. Alabama, supra, and State v. Schmid, 84 N.J. 535 (1980), app. dism. 455 U.S. 100, 102 S.Ct. 867, 70 L.Ed.2d 855 (1982). And see State v. Celmer, 80 N.J. 405, 417-418 (1979), cert. den. 444 U.S. 951, 100 S.Ct. 424, 62 L.Ed.2d 321 (1979), where only the exercise of municipal functions by the Camp Meeting Association of Ocean Grove was declared unconstitutional. We determine, therefore, that insofar as the Corporation exercises non-governmental powers, its actions must be considered in a private rather than a public setting.
The second issue is whether the Corporation as a private entity has improperly interfered with plaintiff's rights. The trial judge rejected all labels to describe the possessory rights of plaintiffs. We disagree with this rejection, finding the labels in this case to be useful. It is clear to us that the Corporation's issuance of the mutual ownership contracts and its transfer to each certificate holder of possessory rights to a specific apartment show defendant to be a cooperative housing corporation. Defendant and the certificate holders have entered into a cooperative housing arrangement as recognized by New Jersey statutes and such case law as exists with respect to residential real estate cooperatives. The fact that the owners receive a "mutual ownership contract" rather than a stock certificate is of no moment. Courts look at the substance of a transaction, not its form. Applestein v. United Board & Carton Corp., 60 N.J. Super. 333, 348 (Ch.Div.), aff'd o.b. 33 N.J. 72 (1960); Shapiro v. Marzigliano, 39 N.J. Super. 61, 65 (App.Div.), certif. den. 21 N.J. 549 (1956). The certificate of incorporation clearly recognized that the contract holders were "members" of the Corporation. They vote to control its policies and exercise the very rights usually held by the owners of the stock in a housing corporation. While their rights may be circumscribed by their mutual agreement, they have the further right to amend these agreements and, in fact, as noted earlier, chose not to do so with respect to the transfer provisions as recently as 1984.
*522 In a cooperative corporation the stockholder not only receives the corporate stock, but also a lease either for a term of years or, through renewability terms, in perpetuity. At the time of the hearing in the Law Division there were no specific New Jersey statutes controlling the establishment, form and method of governance for a housing cooperative, as there are for condominiums. See N.J.S.A. 46:8A-1 et seq. and 46:8B-1 et seq. However, on January 8, 1988 the Legislature enacted N.J.S.A. 46:8D-1 et seq., L. 1987, c. 381, effective May 7, 1988 establishing a title registration system for cooperative units. In that Act "cooperative" is defined as:
any system of land ownership and possession in which the fee to the land and structure is owned by a corporation or other legal entity in which the shareholders or other coowners each also have a long term proprietary lease or other long term arrangement of exclusive possession for a specific unit of occupancy space located within the same structure. [N.J.S.A. 46:8D-3f].
In other legislation, such as the anti-eviction statute, cooperatives are recognized and defined. N.J.S.A. 2A:18-61.7c defines "cooperative" as
a housing corporation or association which entitles the holder of a share or membership interest thereof to possess and occupy for dwelling purposes a house, apartment or other structure owned or leased by said corporation or association, or to lease or purchase a dwelling constructed or to be constructed by said corporation or association.
Further, in the Homestead Tax Relief Act, N.J.S.A. 54A:3A-2b, a "cooperative" is defined as
a housing corporation or association which entitles the holder of a share or membership interest thereof to possess and occupy for dwelling purposes a house, apartment, manufactured or mobile home or other unit of housing owned or leased by the corporation or association, or to lease or purchase a unit of housing constructed or to be constructed by the corporation or association.
The Model Real Estate Cooperative Act, 7B Uniform Laws Annotated, (Master ed. 1985) § 1-103(8), defines "cooperative" as
real estate owned by an association, each of whose members is entitled, by virtue of his ownership interest in the association, to exclusive possession of a unit.
See also Plaza Road Co-op, Inc. v. Finn, 201 N.J. Super. 174, 175 (App.Div. 1985), and AMR Realty Co. v. State, 149 N.J. Super. *523 329, 334-335 (App.Div. 1977), app. dism. 153 N.J. Super. 84 (App.Div. 1977), where this court has applied similar definitions. Applying these definitions, we find that defendant is a cooperative.
We must therefore determine whether in a cooperative setting the right of first refusal and an extremely limited resale policy violate any provision of New Jersey law. We first note that one major difference between condominium ownership and cooperative ownership is the apparent acceptance in the cooperative setting of rights of first refusal, even on terms onerous to the tenant, and the illegality of such rights of first refusal in condominium relationships. Compare N.J.S.A. 46:8B-31, -36 and -38 (governing condominiums) with the lack of any such regulation in the newly-enacted Cooperative Recording Act, N.J.S.A. 46:8D-1 et seq. As noted in 4B Powell, Real Property (1987), § 633.14(1) at 826.2:
Cooperative organizations frequently provide that if a tenant wishes to dispose of his interest, he must first offer it to the corporation at book value before selling it to someone else. The result of such a provision is a distinct disadvantage to the cooperative tenant since he cannot make any individual profit on his investment by taking advantage of rising real estate values. If the market is higher than the investment, the corporation will buy out the tenant and in turn sell at a profit. The reason for this type provision, required under FHA-insured projects, is to prevent speculation and encourage home ownership. [footnotes omitted].
FHA requirements, similar to those imposed in the original mortgage here, are further discussed in Rohan & Reskin, 2 Real Estate Transactions, Cooperative Housing Law and Practice, (Matthew Bender, 1987) § 7.02[3] at 7-10.11  7-10.13; and see Note, "Federal Assistance in Financing Middle Income Cooperative Apartments," 68 Yale L.J. 542, 610-611 (1959). While these authorities criticize as somewhat over-broad the option of first refusal at book value, the cases collected in Rohan & Reskin indicate clearly that at least in New York, from where the bulk of the reported decisions emanate, the restriction is uniformly upheld. Whatever may be the wisdom of incorporating the FHA form of fixed price first refusal *524 option,[3] in view of its statutory genesis and consistent enforcement by the courts which have considered the issue, we cannot determine the provision to be unenforceable in the abstract based merely upon the requirement of occupancy and right of repurchase at book value.[4] Indeed, the Cooperative Recording Act merely provides after a list of required provisions that the master declaration for a cooperative shall contain:
Such other provisions, as may be desired, including but not limited to restrictions or limitations upon the use, occupancy, transfer, leasing or other disposition of any unit (if the restriction or limitation is otherwise permited by law) and limitations upon the use of common elements. [N.J.S.A. 46:8D-6l].
Plaintiffs urge, however, that the particular form of clause employed here, effectively coupling the purchase with a disposition to a class limited to the present occupants and their children, makes the entire scheme an unwarranted restriction on alienation. Plaintiffs further contend that the transfer of their interests is subject to the Law Against Discrimination, *525 N.J.S.A. 10:5-12g(1), and is an illegal restriction on a lease or conveyance under N.J.S.A. 46:3-23. The Corporation argues that the occupancy agreement granted to plaintiffs is not a lease, and the trial judge found that plaintiffs possessed merely
a contractual `right of perpetual use' given to them by the Corporation as part of corporate membership subject to those contractual terms to which they bound themselves, not an interest in real property.
We note that the mutual ownership contract is at least a lease when it grants the "right of perpetual use and enjoyment" of the unit. It also provides for the right of transfer by descent and distribution or by devise. This latter right is absolute to one of the member's "family occupying the unit." As to any other heir or devisee, the ownership is subject to prior approval by the Corporation which we are informed has been interpreted by the Corporation as requiring that the approval not be unreasonably withheld. This approval process is free of the imposition of the Corporation's first refusal option and its priority list concerning new occupants. The Cooperative Recording Act contains a simple definition of a "proprietary lease":
`Proprietary lease' means a grant of a long term exclusive right of possession and occupancy of a designated unit to a coowner or a grant of a leasehold of the cooperative structure. [N.J.S.A. 46:8D-3k].
We perceive the right of the occupant to be that of a tenant; the occupancy terms in the mutual ownership contract constitute the basis of the leasehold. The apartment is rented for a perpetual term, including the right of inheritance and devise subject only to reasonable approval by the Corporation. The leasehold interest is subject to termination only for violation of the agreement's terms, one of which is that the tenant personally occupy the premises.[5]
*526 The cited anti-discrimination statutes are applicable to the leasing of real estate, and have by N.J.S.A. 46:8D-61, quoted earlier, been incorporated by reference into the Cooperative Recording Act (permitting enforcement of a restriction only if it "is otherwise permitted by law"). The Corporation urges that, even if the tenants do possess a leasehold interest, its right of first refusal coupled with its policy to reassign the units solely on the basis of its priority list is not discriminatory. Plaintiffs, however, contend that this policy continues the present ethnic composition of the community.[6] Further, we have noted that among the prohibited bases of discrimination, i.e., race, creed, color, national origin, age, sex, marital status, liability for service in the armed forces, or nationality, is the additional basis of "ancestry." The analysis of the term "ancestry" within the anti-discrimination statutes has been held not to pertain to the mere parent-child relationship within a given family. See Slohoda v. United Parcel Serv., Inc., 193 N.J. Super. 586, 592 (App.Div. 1984); Thomson v. Sanborn's Motor Express, Inc., 154 N.J. Super. 555, 560-561 (App.Div. 1977); and Whateley v. Leonia Bd. of Education, 141 N.J. Super. 476, 478-480 (Ch.Div. 1976), (all holding that anti-nepotism rules may be enforced in employment notwithstanding the prospective employee's exclusion solely on the basis of his "ancestry.")[7]
*527 While plaintiffs, other members of the Corporation or even this court may see other obvious ways for the Corporation to have effected its purpose of preserving family use of the project, we cannot say that the method chosen by the Corporation constitutes an unwarranted restriction on alienation.
Affirmed.
NOTES
[1] The Township of Winfield is located on 105 acres in Union County adjacent to the Garden State Parkway. It was formed in 1941 taking land from the City of Linden and the Township of Clark, and it encompasses a housing development constructed for persons engaged in national defense activities at the Kearny shipyard just prior to the Second World War. The Corporation was formed in December 1941 in accordance with the Lanham Act, 42 U.S.C.A. § 1521 et seq., and the purpose of the Corporation was to "manage, operate, acquire, and own, on a non-profit basis..." the federal housing project being constructed in Winfield. The members of the Corporation were those persons housed within the project and their interests are represented by what is now called a "Mutual Ownership Contract." There are 697 dwelling units within 254 frame buildings in which approximately 1,800 residents of the Township currently reside.
[2] Any other applicant for membership can be considered only if there are no priority list applicants available. It has been more than 19 years since any applicant not on the list has become a member of the Corporation, and generally transfers are made no further down the list than to children of the existing members.
[3] As stated in the Yale Law Journal note, the FHA model upon which the section in the case before us was based "has been justified as drawing home-seekers, not speculators, to the co-op." 68 Yale L.J. at 610. Powell notes that the FHA forms of occupancy agreement and by-laws probably are "more than what is required, since the additional requirement of occupancy by the tenant-purchaser would seem sufficient to accomplish this result." Powell, supra, at p. 826.2.
[4] We distinguish Lambert v. Fishermen's Dock Cooperative, Inc., 61 N.J. 596 (1972). In that case plaintiff sought to retain his shares to a fishermen's cooperative, although the by-laws of the cooperative required members to be actively engaged in the fishing industry. When plaintiff retired, the cooperative terminated his membership paying him merely the original amount of the member-shareholder fee pursuant to a recently amended by-law. The plaintiff objected, contending that an earlier by-law provided he would receive the fair market value of his membership shares rather than the original price. The Court agreed with plaintiff that the amended by-law could not affect the implicit contract between him and the cooperative contained in the earlier by-laws. In the case before us, however, the agreement under which all of the plaintiffs acquired their rights contains the provision now sought to be enforced. Although it is true that in the interim the Corporation had the right to remove the limitation which had been imposed by the federal requirements, in view of its continued imposition of the disputed provisions, plaintiffs cannot bring this case within the principles of Lambert.
[5] Indeed, given the perpetual term of the lease, one might look at this grant as one of title subject to defeasance upon termination of occupancy or breach of the contract. However, in the absence of an express intention to convey title and render the complex a condominium, we read the document to create a tenancy with extended benefits, rather than a transfer of title with limitations. This tenancy pursuant to what we have deemed to be a proprietary lease is, at least for recording purposes, to be treated as a "freehold." N.J.S.A. 46:15-5, as amended by L. 1987, c. 381, § 13, effective May 7, 1988.
[6] The trial judge correctly determined that this claim could not be raised by plaintiffs in this case, since none has attempted to transfer the property to a person of different ethnic background. Counsel for the Corporation has indicated that while the population of the community had been wholly White, through intermarriages there are now two Black residents, and that there is no restriction against inheritance by or devise to a member of any ethnic group.
[7] We recognize the distinction that may be drawn between the anti-nepotism cases, where the exclusion was based upon a single familial relationship, and the case before us where the exclusion is based upon failure to have parents living in a particular community. This line can be somewhat indistinct; if residence is permitted only if one's parents had come from a particular city in Europe or even in this Country, the exclusion might be thought of as discriminatory. In the negative, i.e., if residence could be denied merely because one's parents had resided at a particular location, the exclusion would certainly be discriminatory. These instances, however, must be distinguished from the restriction here before us which seeks to promote family solidarity and to enable children of existing residents to reside close to their parents. Although the restriction on resale of the units by the Corporation is based in part upon ancestry in the communal as opposed to the individual sense, when we read the provision in context as did the judge in Whateley, supra, we do not see any invidious application by the Corporation.