842 A.2d 853 (2004)
367 N.J. Super. 314
The OWNERS OF THE MANOR HOMES OF WHITTINGHAM, Plaintiffs-Appellants,
v.
WHITTINGHAM HOMEOWNERS ASSOCIATION, INC., Members of the Trustees of the Whittingham Homeowners Association for 1996, 1997, 1998, 1999 and 2000, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued September 16, 2003.
Decided March 2, 2004.
*854 Lawrence S. Grossman, Morganville, argued the cause for appellant (Mr. Grossman, on the brief).
John E. Lamastra, Florham Park, argued the cause for respondents (Heim & McEnroe, attorneys; Mr. Lamastra, on the brief).
Before Judges STERN, A.A. RODRÍGUEZ and LEFELT.
The opinion of the court was delivered by A.A. RODRÍGUEZ, J.A.D.
The issue presented in this case is whether the Board of Trustees (Board) of a condominium homeowners association may change the method of calculating maintenance assessments several years after the condominium has been in operation. Based on the circumstances presented here and pursuant to the business judgment rule, we conclude that the Board has such authority.
The Whittingham Condominium community was developed in phases from 1985 until 1995. It consists of three different categories of dwellings: Townhouses, Single Detached Homes, and Manor Homes. The Manor Homes are apartment units which are clustered in groups of four in one structure. In each of the categories, there are models of varying sizes. The developer of Whittingham, Union Valley Corp., collected maintenance assessments from 1985 until 1995. In 1995, the ownership transition was completed and individual owners assumed control of the Whittingham Homeowners Association (Association).
The Declaration of Covenants, Conditions and Restrictions (Declaration) provides for the collection of maintenance assessments by the Association. The maintenance assessment includes fixed expenses and variable expenses components. The fixed expenses are allocated on an equal basis to all homes, "regardless of value, size, or type." However, variable expenses, typically exterior maintenance, repairs, ground's care, and insurance are calculated according to a formula based on the proportion of a unit's "square footage" to the aggregate "square footage" of all units for which a certificate of occupancy has been issued. Unfortunately, the term "square footage" is not defined in the Declaration, Master Deed or the By-laws. The interpretation of that term lies at the center of this dispute.
During the period of developer control, the variable expense assessment was allocated according to certain measurements of each unit (the developer measurements). It is not clear how the developer arrived at these measurements, which were used in the first year operating budget. These measurements differed from those found in the architectural drawings made by Stephen Mark Goldner Associates, which were attached to the Public Offering
*855 Statement. A third and different set of measurements were indicated in the developer's sales brochure. More importantly, although there are different models of varying sizes in each category, the same square foot measurement was used for all models in one category, i.e., Townhouse = 1619, Single Detached = 1488 and Manor Homes = 1034. It is suggested in this appeal that the developer measured the exterior wall of the foundations to arrive at these figures.
After the unit owners assumed control of the Association, its Board decided to remeasure all of the units. The Association commissioned Coral Construction Co. (Coral) to do this task. Coral submitted a report in September 1995 establishing the following square footages for the models in each category:

 TOWNHOMES
 Gramby 1729.96
 Wellsley 1766.30
 Stafford 1802.31
 Haverhil 1918.26
 SINGLE DETACHED
 Duxbury 1160.39
 Brattleboro 1304.74
 MANOR HOMES
 C-1 1327.60
 C-2 1379.60
 C-3 1250.36
 C-4 1329.37

The Coral measurements reflect the interior square footage of each unit. According to the Association's brief, it instructed Coral to measure the interior living space of each unit because the Master Deed describes each condominium unit as:
the area bounded by the interior surface of the perimeter walls of the garage to which there is direct access from the interior of the remainder of said unit, and the floor and ceiling of said garage.
As a result of the Coral measurements, the variable expense maintenance assessment for each Manor Home increased. This caused a concomitant decrease in the variable maintenance assessment of Townhouse and Single Detached units. From November 1995 until the present, the maintenance assessment has been allocated according to the Coral measurements.
In July 1996, Louis Eisenberg, a Townhouse unit owner, wrote a letter to the Board questioning the change in measurements and resulting adjustment in the assessment allocation. Twenty-two other unit owners joined in the letter. The Board responded via a letter signed by the Board President, which explained the need for remeasuring. The letter stated:
Please also refer to the Architectural Plans submitted by [Stephen] Mark Goldner Associates and note they do not conform to the calculations for square footage on [Townhouses, Single Detached and Manor Homes] as cited in the Prospectus.
In addition, a Union Valley brochure listing square footage of models for sale in 1990 showed different numbers than those in the Prospectus. It was decided by the Board that in as much as Section II was undergoing transition it would be prudent for the Board to define square footage (heretofore underfined). The Board determined that square footage was living space within each model and hired Coral Construction to re-measure the units. The information was submitted to the Budget and Finance Committee and maintenance fees were approved by the Board.
The method of allocation was explained at several ensuing Homeowners Association meetings.
The Board's letter was followed by a legal opinion dated November 18, 1996, from E. Richard Kennedy, the Board's counsel. The Kennedy legal opinion indicates that the Board acted properly and within its authority pursuant to governing *856 documents when it recalculated maintenance fees based on the Coral measurements. In September 1999, Kennedy sent another legal opinion on the same subject in response to written inquiries from Eugene Sultan, another unit owner. This opinion also indicates that the Board acted properly when remeasuring the units and recalculating maintenance fees.
In October 2001, six years after the Board accepted the Coral measurements as the basis for calculating the variable expenses maintenance assessment, Eisenberg and others brought this action on behalf of the "Owners of the Manor Homes of Whittingham" (plaintiffs), against the Whittingham Homeowners Association, Inc., and members of the successive Boards of Trustees for the years from 1996 to 2000 (collectively "Association"). Plaintiffs sought a refund for the difference between the variable maintenance assessments calculation pursuant to the Coral measurements and those calculated in accordance with the developer measurements.
The Association answered and moved for summary judgment. In support of its motion, the Association submitted a certification by Jim Ungerleider, a member of the Board from 1995 until September 1996, and a Single Detached unit owner. The Ungerleider certification outlined the steps taken by the Association to remeasure the unit. It also indicates that the measurements used by the developer were "unclear and/or inaccurate." At oral argument, Judge Amy Piro Chambers requested additional briefs and materials, including a schedule of maintenance assessments from the date of the first operating budget to the present.
Judge Chambers granted the Association's motion for summary judgment finding that the adjustment in maintenance assessments based on the Coral measurements had been relatively small. The judge observed, based on a review of the schedule of assessments, "it appears there is generally stability, certainly for the [Manor House] units." The judge also noted that plaintiffs had taken a long time to bring a lawsuit, considering the change occurred in 1996. The judge concluded that the Board had the authority to order the measuring by Coral and to change maintenance assessments based on those measurements. The judge said:
the Board was confronted at the beginning of thewhen it began to take charge of the units [it] was confronted with the variety of measurements in the developer's documents. It had to have some uniform approach. It hired professionals, made measurements based on rational criteria, and it had the authority to do so.
On appeal, plaintiffs contend that: (1) there is a significant issue of facts based upon the items presented in the opposition to the motion of summary judgment; (2) the judge made a determination based upon laches, which is not pertinent in this matter; and (3) the affidavit of James Ungerleider is self-serving and incorrect. We disagree. Although some factual disputes exist, they are not material to the central issue in this case, i.e., whether the Board had the authority to order a remeasuring of square footage in order to calculate maintenance assessments. The judge made some observations regarding the lateness of the complaint and the relatively minor adjustment in assessments after the remeasuring. However, the basis of her opinion was not a finding of laches, but a legal conclusion that the Board had the authority to act and did so properly. We agree with this conclusion.
The Condominium Act, N.J.S.A. 46:8B-1 to -38, gives a condominium association the power and responsibility to *857 make common expense assessments. N.J.S.A. 46:8B-14(a). "Common expenses" means:
expenses for which the unit owners are proportionally liable, including but not limited to:
(i) all expenses of administration, maintenance, repair and replacement of the common elements;
(ii) expenses agreed upon as common by all unit owners; and
(iii) expenses declared common by provisions of this act or by the master deed or by the bylaws.

[N.J.S.A. 46:8B-3e].
The Condominium Act requires that common expenses, such as maintenance fees,
shall be charged to unit owners according to the percent of their respective undivided interest in the common elements as set forth in the Master Deed and amendments, thereto, or in such other proportions as may be provided in the master deed or by-laws.

[N.J.S.A. 46:8B-17.]
Here, we have not been provided with the portion of the Master Deed that sets out the percentage of common elements for each unit. However, we accept the statement by the Association that the Master Deed does not specify how the common expenses assessments should be allocated. Therefore, we look to the By-laws. These provide that:
[t]he amount of monies for Common Expenses deemed necessary by the Board and the manner of expenditure thereof, including but not limited to, the allocation thereof, shall be a matter for the sole discretion of the Board.

[By-laws, Article VI, Section 2.]
There is a similar provision in the Declaration.[1]
The Declaration also provides that "it shall be an affirmative obligation of the Homeowners Association and its Board to fix assessments in an amount sufficient to maintain the Lots and the exterior of all Homes...." The Declaration goes on to state that, "maintenance fees will include both fixed and variable costs and will be allocated by the Board in accordance with the variable services which a homeowner receives." The variable expenses component is to be determined as follows:
[t]he assessment ... shall be equal to that fraction of the total assessment for such purposes in the Community, the numerator of which is the square footage for the particular model of Home affected and the denominator of which is the aggregate of such square footage for all Homes within the Property for which a certificate of occupancy has been issued by the Township of Monroe as of the date the assessment is established.

[Declaration, Article IV, Section 3.]
Thus, the Whittingham governing documents provide an alternative method for calculating common expenses other than the percentage of ownership of common elements, which is permitted, indeed, contemplated by the appropriate section of the Condominium Act. N.J.S.A. 46:8B-17.
Plaintiffs allege that the developer measurement, "was the outside foundation walls while the new measurement [is] the inside measurement of the living space."
*858 Plaintiffs argue that the developer's measurements are "the correct calculation." The flaw in plaintiffs' argument is the assumption that there is only one correct measure for allocating common expenses. We find no authority that supports that principle. Instead, the statutory language strongly suggests a grant of discretion to the Association and its Board. If more than one method is suitable, the Board has a choice. However, such discretion is not to be exercised unreasonably or arbitrarily. The courts will intervene in the case of such an abuse.
Courts have used various standards to review condominium governance. See Thanasoulis v. Winston Towers 200 Ass'n, 110 N.J. 650, 666, 542 A.2d 900 (1988) (Garibaldi, J., dissenting). These standards include a constitutional approach, an administrative rulemaking approach, and a "business judgment rule." Ibid. For a discussion of these standards, see Note, Judicial Review of Condominium Rulemaking, 94 Harv. L.Rev. 647 (1981), and Thanasoulis v. Winston Tower 200 Ass'n, 214 N.J.Super. 408, 420, 519 A.2d 911 (App.Div.1986) (Cohen, J.A.D., dissenting), rev'd, 110 N.J. 650, 542 A.2d 900 (1988). The Supreme Court has adopted the business rule as the more appropriate analytical framework for judicial review of condominium rulemaking. Thanasoulis, supra, 110 N.J. at 666, 542 A.2d 900.
The business judgment rule established the following two-prong test to determine whether the association has breached its fiduciary duty in adopting the challenged by-law: (1) whether the Associations' actions were authorized by statute or by its own by-laws or master deed, and if so, (2) whether the action is fraudulent, self-dealing or unconscionable. Chin v. Coventry Square Condo., 270 N.J.Super. 323, 328-29, 637 A.2d 197 (App.Div.1994). See also Siller v. Hartz Mountain Assoc., 93 N.J. 370, 382, 461 A.2d 568, cert. denied, 464 U.S. 961, 104 S.Ct. 395, 78 L.Ed.2d 337 (1983); Papalexiou v. Tower West Condo., 167 N.J.Super. 516, 527, 401 A.2d 280 (Ch.Div.1979).
As to the first prong of the business rule, we have already discussed how the Condominium Act authorizes the Board's action. As to the second prong, we perceive nothing in the record that the assessments based on the Coral measurements were fraudulent or unreasonable. There is no allegation that the measurement of the interior space is inaccurate. Likewise, there has not been a substantial fluctuation in the pre- and post-Coral measurement assessments. Lastly, there is no indication that the Association or Board has benefited by the remeasuring. There is an indirect allegation that those Board members who are Townhouse or Single Detached unit owners have benefited because their assessment decreased slightly. However, there was an independent business reason for doing the remeasurement, i.e. the source of the developer measurements were unclear and contradicted by architectural drawings. Moreover, the timing was appropriate because it occurred when individual unit owners assumed control over the Association and a new phase of the condominium development was about to undergo an ownership transition. We do not perceive any self-dealing in the Board's action. Absent these circumstances, however, the Board's action in modifying the assessment allocation in "mid-stream" might be scrutinized for "self-dealing."
For future guidance, despite a Board's ample discretion, it should not alter the method for assessing common expenses, without a valid, objective reason for such modification. In fact, modifications in the method for calculating common *859 expenses should be the exception, rather than the rule. Such modification should not be dictated by a change in the composition of the board.
Affirmed.
NOTES
[1] The Declaration states:

The amount of monies for assessments deemed necessary by the Board to discharge the responsibility of the Board and the manner of expenditure thereof, including but not limited to, the allocation thereof, shall be a matter for the sole discretion of the Board.
[Declaration, Article IV, Section 3.]