929 A.2d 1060

COMMITTEE FOR A BETTER TWIN RIVERS (CBTR); DIANNE
MCCARTHY; HAIM BAR-AKIVA AND BRUCE FRITZGES,
PLAINTIFFS-RESPONDENTS, AND EDWARD MCDONALD
AND EMILY MCDONALD, PLAINTIFFS, v. TWIN RIVERS
HOMEOWNERS' ASSOCIATION (TRHA); TWIN RIVERS COM-
MUNITY TRUST AND SCOTT POHL (TRHA PRESIDENT), DE-
FENDANTS-APPELLANTS, AND JENNIFER WARD (TRHA
ADMINISTRATOR), DEFENDANT.

Argued January 4, 2007—Decided July 26, 2007.

*Barry S. Goodman* argued the cause for appellants Twin Rivers Homeowners' Association and Twin Rivers Community Trust (*Greenbaum, Rowe, Smith & Davis* and *Kennedy, Wronko & Kennedy*, attorneys; *Mr. Goodman* and *Karyn A. Kennedy Branco*, of counsel; *Mr. Goodman, Ms. Branco, Jane J. Felton* and *E. Richard Kennedy*, on the briefs).

*Michael S. Karpoff* argued the cause for appellant Scott Pohl (*Hill Wallack*, attorneys).

*Frank Askin*, Counsel, Rutgers Constitutional Litigation Clinic, argued the cause for respondents, on behalf of American Civil Liberties Union Foundation of New Jersey.

*Dennis R. Casale* submitted a brief on behalf of *amicus curiae* Community Association Institute (*Pepper Hamilton; Hueston, McNulty, Mueller & DeGonge* and *Nowell Amoroso Klein & Bierman*, attorneys; *Mr. Casale, Samuel J. McNulty* and *Thomas Martin*, of counsel).

*Frank L. Corrado*, Special Counsel, submitted a brief on behalf of *amicus curiae* Public Advocate of New Jersey (*Ronald K. Chen*, Public Advocate of New Jersey and *Barry, Corrado, Grassi & Gibson*, attorneys).

*Steven Siegel* submitted a brief on behalf of *amicus curiae* AARP (*Sokol, Behot & Fiorenzo*, attorneys; *Mr. Siegel, Franco A. Munoz* and *Susan Ann Silverstein*, members of the District of Columbia bar, of counsel and on the brief).

Justice WALLACE, JR. delivered the opinion of the Court.

In this appeal, we determine whether the rules and regulations enacted by a homeowners' association governing the posting of signs, the use of the community room, and access to its newsletter violated our state constitutional guarantees of free expression. The trial court held that the association's rules and regulations were not subject to the right of free speech embodied in our State Constitution. On appeal, the Appellate Division reversed. We granted certification and now reverse the judgment of the Appellate Division.

We start from the proposition that all citizens of this State, including the residents of Twin Rivers, possess the constitutional right to free speech and assembly. We acknowledge, however, that those rights are not absolute, as citizens may waive or otherwise curtail their rights. This case presents us with a hybrid setting to apply the standards set forth in *State v. Schmid*, 84 *N.J.* 535, 423 *A.*2d 615 (1980), *appeal dismissed sub nom. Princeton University v. Schmid*, 455 *U.S.* 100, 102 *S.Ct.* 867, 70 *L.Ed.*2d 855 (1982) and *New Jersey Coalition Against War in the Middle East v. J.M.B. Realty Corp.*, 138 *N.J.* 326, 650 *A.*2d 757 (1994), *cert. denied*, 516 *U.S.* 812, 116 *S.Ct.* 62, 133 *L.Ed.*2d 25 (1995). In applying the *Schmid/Coalition* multi-faceted standard, we conclude that the Association's policies, as set forth in its rules and regulations, do not violate our constitution.

## I.

The facts are from the record created in the parties' cross-motions for summary judgment. Twin Rivers is a planned unit development consisting of privately owned condominium duplexes, townhouses, single-family homes, apartments, and commercial buildings located in East Windsor, New Jersey. The community covers approximately one square mile and has a population of approximately 10,000 residents. The Twin Rivers Community Trust (Trust) is a private corporation that owns Twin Rivers's common property and facilities. The Trust was created by indenture on November 13, 1969, for the stated purpose of owning, managing, operating, and maintaining the residential common property of Twin Rivers. The administrator of the Trust certified that "Trust-owned property and facilities are for the exclusive use of Twin Rivers residents and their invited guests," and that the "general public is not invited" to use them.

The Twin Rivers Homeowners' Association (Association) is a private corporation that serves as trustee of the Trust. The Trust authorizes the Association to make rules and regulations for the conduct of its members while occupying the land owned or controlled by the Trust, to provide services to its members, and to maintain the common lands and facilities in Twin Rivers. The Association maintains the Trust's private residential roads, provides street lighting and snow removal, assigns parking spaces in its parking lots, and collects rubbish in portions of Twin Rivers. By acquiring property in Twin Rivers, the owner automatically becomes a member of the Association and subject to its Articles of Incorporation (Articles) and Bylaws.

The Articles authorize the Association to exercise all of the powers, rights, and privileges provided to corporations organized under the New Jersey Nonprofit Corporation Act, *N.J.S.A.* 15A:1–1 to –10. The Bylaws additionally authorize the Association to adopt, publish, and enforce rules governing the use of common areas and facilities. The Bylaws may be amended by a majority

of a quorum of members present in person or by proxy at a regular or special meeting of the members.

The Association is governed by a Board of Directors (Board), whose members are elected by all eligible voting members of the Association. The Board is responsible for making and enforcing the rules, and for providing services to its members that are financed through mandatory assessments levied against residents pursuant to an annual budget adopted by the Board.

Prior to the commencement of this litigation, various residents of Twin Rivers formed a committee, known as the Committee for a Better Twin Rivers (Committee), for the purpose of affecting the manner in which Twin Rivers was governed. Eventually, the Committee and three individual residents of Twin Rivers (collectively, plaintiffs) filed a nine-count complaint against the Association and Scott Pohl, the president of the Association, seeking to invalidate various rules and regulations. Plaintiffs subsequently amended their complaint to include the Trust as a defendant. The thrust of the complaint was that the Association had effectively replaced the role of the municipality in the lives of its residents, and therefore, the Association's internal rules and regulations should be subject to the free speech and free association clauses of the New Jersey Constitution. Although plaintiffs' complaint consisted of nine counts, only the first three counts are relevant to this appeal.

In count one of the complaint, plaintiffs sought to invalidate the Association's policy relating to the posting of signs. The Association's sign policy provided that residents may post a sign in any window of their residence and outside in the flower beds so long as the sign was no more than three feet from the residence. In essence, the policy limits signs to one per lawn and one per window. The policy also forbids the posting of signs on utility poles and natural features within the community. The stated purpose for the sign policy is to avoid the clutter of signs and to preserve the aesthetic value of the common areas, as well as to allow for lawn maintenance and leaf collection. Plaintiffs sought

injunctive relief to permit the posting of political signs on the property of community residents "and on common elements under reasonable regulation," on the basis that the current policy was unconstitutional.

In count two, plaintiffs complained of the Association's policy in respect of the use of its community room. In general, the community room is available to residents of Twin Rivers, as well as clubs, organizations, and committees approved by the Trust who want to rent the room for parties or other events. When the complaint was filed, the community room policy involved a two-tiered rental charge system that differentiated between the uses of the room. However, during the pendency of this action, the Association amended the community room policy to eliminate the tier system in favor of a uniform rental fee of $165 and a refundable security deposit of $250. Additionally, a certificate of insurance naming the Association as an insured was required. The rental fees were intended to cover the costs associated with the maintenance of the room.

Plaintiffs asserted that the community room policy denied them equal protection of the laws and unreasonably and unconstitutionally violated their right to access the community room on a fair and equitable basis. They sought temporary and permanent injunctions "to allow [p]laintiffs to utilize the community room in the same manner as other similarly situated entities." Plaintiffs also urged that the rental fees were excessive because they were not related to the actual rental costs incurred by the Association.

In count three, plaintiffs alleged they were denied equal access to the Association's monthly newspaper, Twin Rivers Today (Today). The purpose of the newspaper is to provide residents with news and information that concerns the community. The editorial committee of Today selects the content of the newspaper. The paper is delivered to all Twin Rivers residents, but not to the general public. Plaintiffs sought a declaration that all Twin Rivers residents should have "equal access" to the pages of Today. Also, plaintiffs sought a permanent injunction enjoining the presi-

dent of the Board from using Today "as his own personal political trumpet."

The Association filed a motion for summary judgment, and plaintiffs filed a cross-motion for summary judgment. The material facts were not disputed. The trial court issued a comprehensive opinion, granting defendants' motion for summary judgment on the sign claims in count one and on the newspaper claims in count three. The court, however, granted plaintiffs partial relief in respect of the community room claims in count two.

Central to the trial court's decision was the determination that Twin Rivers was not a "quasi-municipality," and thus was not subject to the New Jersey Constitution's free speech and association clauses. The court noted that while the Association asserted considerable influence on the lives of Twin Rivers residents, that impact was a function of the contractual relationship that residents entered into when they elected to purchase property in Twin Rivers. The court applied the traditional test for evaluating the reasonableness of restrictive covenants and found that the covenant relating to the posting of signs was reasonable and enforceable. Although the trial court upheld the amended policy of a unified rate for the community room, it found that the regulations for use of the community room were impermissibly vague. The court directed the Association to modify the regulations to provide clear standards for the granting or withholding of permission for the room's use. Further, the court concluded that plaintiffs were not denied access to the Association's newspaper and that it would be improper under constitutional principles of free press for the court to exert control over its contents.

Plaintiffs appealed. In a published opinion, the Appellate Division reversed the trial court, holding that the Association was subject to state constitutional standards with respect to its internal rules and regulations. *Comm. for a Better Twin Rivers v. Twin Rivers Homeowners' Ass'n*, 383 *N.J.Super.* 22, 35, 890 *A.*2d 947 (App.Div.2006). "[I]n balancing the interests of the parties," the panel found that "plaintiffs' rights to engage in expressive

exercises ... must take precedence over the [Association's] private property interests." *Id.* at 42–43, 890 *A.*2d 947. The panel thus remanded counts one, two, and three for reconsideration in light of that determination. *Id.* at 68, 890 *A.*2d 947.

The Association petitioned this Court for certification on whether the New Jersey Constitution applies to its internal rules and regulations. Plaintiffs cross-petitioned for certification on an issue unrelated to this appeal. We granted the Association's petition and denied plaintiffs' cross-petition. 186 *N.J.* 608, 897 *A.*2d 1061 (2006).

## II.

The Association argues that the test in *State v. Schmid, supra,* controls the disposition of this appeal, and contends that under that test, it was error to impose constitutional obligations on its private property. The Association urges this Court to follow the vast majority of other jurisdictions that have refused to impose constitutional obligations on the internal membership rules of private homeowners' associations. In support of that view, the Association emphasizes that it does not invite public use of its property, and its members participate in the decision-making process of the Association. Additionally, its members are afforded extensive statutory protections, and the business judgment rule protects members from arbitrary decision-making. Further, the Association contends that the relationship with its members is a contractual one, set forth in reasonable and lawful restrictive covenants that appear in all property deeds.

Defendant Pohl argues that the First Amendment bars a court from asserting control over the content and editorial policies of the Association's newspaper, maintaining that the First Amendment gives the Association discretion to determine the content of its newspaper. He urges this Court to reinstate the trial court's grant of summary judgment in favor of the Association dismissing count three.

In contrast, plaintiffs ask this Court to affirm the judgment of the Appellate Division to find that the New Jersey Constitution limits the manner in which the Association interacts with its members. They urge that political speech is entitled to heightened protection and that they should have the right to post political signs beyond the Association's restricted sign policy. Plaintiffs further contend that the excessive fees charged for the use of the community room are not reasonably related to the actual costs incurred by the Association. Finally, plaintiffs claim that the State Constitution requires that the Association publish plaintiffs' views on an equal basis with which the Association's views are published in its newspaper.

We granted amicus curiae status to the Community Association Institute, the Public Advocate of New Jersey, and the AARP Foundation. The latter two entities favor plaintiffs' position, while the Community Association Institute supports the Association's position.

### III.

Our constitution affirmatively grants to individuals the rights of speech and assembly.

> Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press.

[*N.J. Const.* art. I, ¶ 6.]

. . . .

> The people have the right freely to assemble together, to consult for the common good, to make known their opinions to their representatives, and to petition for redress of grievances.

[*N.J. Const.* art. I, ¶ 18].

■ This Court has long held that the rights of speech and assembly cannot be curtailed by the government. *King v. S. Jersey Nat'l Bank,* 66 *N.J.* 161, 177, 330 *A.*2d 1 (1974). Moreover, under limited circumstances, we have determined that those constitutional rights may be enforced against private entities. *Schmid, supra,* 84 *N.J.* at 559, 423 *A.*2d 615. In fact, our

constitutional guarantee of free expression "is an affirmative right, broader than practically all others in the nation." *Green Party v. Hartz Mountain Indus., Inc.*, 164 *N.J.* 127, 145, 752 *A.*2d 315 (2000). Here, we must determine whether this case presents one of those limited circumstances where, in the setting of a private community, the Association's rules and regulations are limited by the constitutional rights of plaintiffs.

## A.

■ Federal case law has evolved to require that there must be "state action" to enforce constitutional rights against private entities. *Marsh v. Alabama,* 326 *U.S.* 501, 66 *S.Ct.* 276, 90 *L.Ed.* 265 (1946), is recognized as the leading case in this area of law. In *Marsh,* a private company owned and controlled all aspects of the town. *Id.* at 502, 66 *S.Ct.* at 277, 90 *L.Ed.* at 266. The company refused to allow solicitation and the distribution of religious literature. *Id.* at 503, 66 *S.Ct.* at 277, 90 *L.Ed.* at 267. Marsh was arrested for trespassing while distributing religious literature on company-owned land that was otherwise open to the public. *Ibid.* The Court explained that "[t]he more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." *Id.* at 506, 66 *S.Ct.* at 278, 90 *L.Ed.* at 268 (citation omitted). The Court then balanced the constitutional rights of the property owners against the First Amendment rights of Marsh to find that "the latter occupy a preferred position." *Id.* at 509, 66 *S.Ct.* at 280, 90 *L.Ed.* at 270 (footnote omitted). The Court concluded that, in those limited circumstances, the property owner's action constituted "state action" and violated the First Amendment. *Id.* at 508–09, 66 *S.Ct.* at 279–80, 90 *L.Ed.* at 269–70.

The United States Supreme Court later considered the application of *Marsh* to shopping centers. In the first case to address the issue, the Court held that the reasoning of *Marsh* applied to a shopping mall. *See Amalgamated Food Employees Union Local*

*590 v. Logan Valley Plaza, Inc.*, 391 *U.S.* 308, 325, 88 *S.Ct.* 1601, 1612, 20 *L.Ed.*2d 603, 616 (1968). However, the Court subsequently retreated from that position and, in a later case, concluded that the First Amendment affords no general right of free speech in privately owned shopping centers. *See PruneYard Shopping Ctr. v. Robins*, 447 *U.S.* 74, 80–81, 100 *S.Ct.* 2035, 2040, 64 *L.Ed.*2d 741, 751–52 (1980) (noting that although First Amendment did not grant right of free expression in shopping centers, states may adopt greater free speech rights); *Hudgens v. NLRB*, 424 *U.S.* 507, 520–21, 96 *S.Ct.* 1029, 1036–37, 47 *L.Ed.*2d 196, 207 (1976).

### B.

Our jurisprudence has not been as confining. We briefly outline the development of our law expanding the application of free speech or similar constitutional rights against non-governmental entities.

In *State v. Shack*, 58 *N.J.* 297, 300–01, 277 *A.*2d 369 (1971), this Court was asked to apply the principles of *Marsh* to a private farm operation. In *Shack*, two employees of federally funded organizations were arrested for trespassing when they entered private property to provide legal and medical assistance to migrant workers. *Id.* at 299–300, 277 *A.*2d 369. The defendants challenged the constitutionality of the trespassing statute on several grounds. *Id.* at 301, 277 *A.*2d 369. However, the Court declined to rule on the constitutional challenge, noting only that *Marsh* was inapplicable because the land in question was not open to the public. *Id.* at 301–02, 277 *A.*2d 369. Applying our common law, this Court held that the defendants' conduct did not constitute trespass within the meaning of the statute under which they were prosecuted. *Id.* at 308, 277 *A.*2d 369. Thus, the broader issue of whether the federal or State Constitution required access to the land remained unresolved. *Id.* at 302, 277 *A.*2d 369.

Almost ten years passed before this Court decided the landmark *Schmid* case. In *Schmid, supra,* Princeton University, a private, non-profit institution, prohibited persons not affiliated with the

university from soliciting and distributing political literature on campus. 84 *N.J.* at 538–39, 423 *A.*2d 615. The defendant, a non-student, was arrested and convicted for trespassing while distributing Labor Party materials on the Princeton campus. *Id.* at 538, 541, 423 *A.*2d 615. Princeton's regulations required off-campus organizations to obtain permission before distributing materials. *Id.* at 539, 423 *A.*2d 615. The defendant claimed that his arrest was unconstitutional because distribution of political material was protected by both the First Amendment and Article I of the New Jersey Constitution. *Id.* at 542, 423 *A.*2d 615. Princeton argued that as a private institution, it was not subject to the strictures of the federal or State Constitutions. *Ibid.*

> Analyzing Princeton's claim, the Court recognized that the constitutional equipoise between expressional rights and property rights must be similarly gauged on a scale measuring the nature and extent of the public's use of such property. Thus, even as against the exercise of important rights of speech, assembly, petition and the like, private property itself remains protected under due process standards from untoward interference with or confiscatory restrictions upon its reasonable use.
>
> [*Id.* at 561, 423 *A.*2d 615 (citations omitted).]

■ The Court crafted "the test to be applied to ascertain the parameters of the rights of speech and assembly upon privately owned property and the extent to which such property reasonably can be restricted to accommodate these rights." *Id.* at 563, 423 *A.*2d 615. That test requires courts to consider

> (1) the nature, purposes, and primary use of such private property, generally, its "normal" use, (2) the extent and nature of the public's invitation to use that property, and (3) the purpose of the expressional activity undertaken upon such property in relation to both the private and public use of the property.
>
> [*Ibid.*]

The Court explained that such a test would allow the court "to ascertain whether in a given case owners of private property may be required to permit, subject to suitable restrictions, the reasonable exercise by individuals of the constitutional freedoms of speech and assembly." *Ibid.* In assessing the reasonableness of any restrictions, the court shall consider "whether there exist convenient and feasible alternative means to individuals to engage

in substantially the same expressional activity." *Ibid.* The Court applied the test to Princeton and found that the university had invited the public to use its facilities, the defendant's expressional activities were consonant with both the private and public uses of Princeton's campus, and Princeton's regulations contained no standards for governing the exercise of free speech. *Id.* at 564–69, 423 *A.2d* 615. Therefore, the Court concluded that Princeton violated the defendant's constitutional rights of speech and assembly. *Id.* at 569, 423 *A.2d* 615.

In *Bluvias v. Winfield Mutual Housing Corp.,* 224 *N.J.Super.* 515, 520–21, 540 *A.2d* 1324 (App.Div.), *certif. granted,* 111 *N.J.* 621, 546 *A.2d* 538 (1988), the Appellate Division considered a constitutional challenge brought against a mutual housing corporation under circumstances similar to the present case. In *Bluvias,* with the exception of the streets, the Winfield Mutual Housing Corporation (Corporation) owned the entire Township of Winfield (Township), including the municipal building, school, shopping area, and the dwelling units. *Id.* at 518, 540 *A.2d* 1324. The Corporation had acquired the property in late 1950 from the federal government. *Ibid.* Pursuant to the terms of its mortgage, each member of the Corporation was required to execute a mutual ownership contract to establish the right to " 'perpetual use in a dwelling unit' in the project and imposed restrictions on becoming a 'member' of the Corporation." *Ibid.* If a member ceased to occupy the dwelling unit, the Corporation had the right to acquire the unit for a set price. *Id.* at 519, 540 *A.2d* 1324. Even after the Corporation paid off the mortgage and the restriction on transfer lapsed, a majority of the members voted to continue the restrictions. *Ibid.*

The plaintiffs were members of the Corporation who wanted the right to transfer their units without first offering the unit to the Corporation. *Id.* at 520, 540 *A.2d* 1324. The plaintiffs brought suit against the Corporation, asserting that the bylaws and rules of the Corporation violated their constitutional right to sell their property. *Ibid.* The Appellate Division found that the nature of

the Corporation, although it owned all the land, was not a company town under the definitions of *Marsh* and *Schmid. Id.* at 520–21, 540 *A.*2d 1324. Because the Township had its own government and included citizens who were not members of the Corporation, and because all powers usually held by a municipality were exercised by the Township, the panel concluded that the actions of the Corporation were private, not public. *Id.* at 520–21, 540 *A.*2d 1324.

We granted certification to consider "whether the membership by-laws promulgated by [the Corporation] constitute[d] governmental action and a denial of equal protection under the Federal and New Jersey Constitutions." *Bluvias v. Winfield Mut. Hous. Corp.,* 114 *N.J.* 589, 590, 556 *A.*2d 321 (1989) (internal quotations omitted). Later, however, we dismissed the appeal as improvidently granted because we found "no issue of constitutional dimension." *Ibid.* We noted that the Corporation, although it owned all of the property and dwelling units within the Township, was not a state actor under *Marsh,* and thus, it was not subject to constitutional standards. *Ibid.* Further, we noted that "[a] duly-elected governing body and a board of education established under law administer[s] any necessary governmental services" within the Township. *Ibid.*

The Court expanded the *Schmid* test in *New Jersey Coalition Against War in the Middle East v. J.M.B. Realty Corp.,* 138 *N.J.* 326, 650 *A.*2d 757 (1994), *cert. denied,* 516 *U.S.* 812, 116 *S.Ct.* 62, 133 *L.Ed.*2d 25 (1995). In *Coalition,* the plaintiffs sought judicial approval to permit their members to distribute leaflets in shopping centers to support opposition to any military action in the Middle East. *Id.* at 336–37, 650 *A.*2d 757. The Court concluded that "each of the elements of the [*Schmid* ] standard and their ultimate balance support the conclusion that leafleting is constitutionally required to be permitted." *Id.* at 356–57, 650 *A.*2d 757. Thus, the Court not only relied on the three-pronged test in *Schmid,* but also on the general balancing of expressional rights and private interests. *Id.* at 362, 650 *A.*2d 757. Nevertheless, the

Court recognized that regional shopping centers have broad powers to adopt reasonable conditions "concerning the time, place, and manner of such leafleting." *Ibid.* The Court limited its holding to "leafleting and associated speech in support of, or in opposition to, causes, candidates, and parties—political and societal free speech." *Id.* at 374, 650 *A.*2d 757. To avoid future questions, the Court addressed the "horribles" the defendants asserted would be the inevitable consequence of its decision. *Id.* at 373, 650 *A.*2d 757. The Court emphasized that "[n]o highway strip mall, no football stadium, no theatre, no single high suburban store, no stand-alone use, and no small to medium shopping center sufficiently satisfies the standard of *Schmid* to warrant the constitutional extension of free speech to those premises, and we so hold." *Ibid.*

This Court has also addressed the proper standard for determining the reasonableness of restrictions that shopping mall owners may impose on leafleting and other political and societal speech. *Green Party, supra,* 164 *N.J.* at 131, 752 *A.*2d 315. In *Green Party,* the plaintiffs sought to invalidate three regulations the shopping mall adopted to limit leafleting and other similar activities. *Ibid.* The mall required the plaintiffs to obtain a $1,000,000 insurance policy, "to limit their access to the mall to one day, or a few days a year," and to execute a "hold harmless" agreement in favor of the mall. *Ibid.* (internal quotations omitted).

The Court applied the principles of *Schmid* and *Coalition,* explaining that in balancing the rights of citizens to speak and assemble against the private property rights of mall owners, the court must consider the nature and importance of the affected right, the extent to which the restriction impedes that right, and the mall's need for retaining the restriction. *Id.* at 148–49, 752 *A.*2d 315. The Court emphasized that "[t]he more important the constitutional right sought to be exercised, the greater the mall's need must be to justify interference with the exercise of that right." *Id.* at 149, 752 *A.*2d 315 (citation omitted). The Court concluded that the proofs in favor of the mall's restrictions did not

establish that they were intended "to achieve legitimate business objectives while preserving the leafleteers['] expressive rights." *Id.* at 157–58, 752 *A.*2d 315. Consequently, the Court invalidated the conditions imposed for insurance and the hold harmless agreement, noting that a "hold harmless agreement related to the actual activities of the leafleteers that cause liability to be created would not be objectionable." *Id.* at 158, 752 *A.*2d 315. Although the Court recognized that the parties may have reached an agreement concerning the number of days when leafleting may be sought, the Court found that "more than one day per year is reasonably required to exercise the expressive rights requested." *Ibid.*

## C.

Our review of the case law in other jurisdictions reveals that only a handful of states recognize a constitutional right to engage in free speech, assembly, or electoral activity on privately owned property held open to the public, such as a shopping mall or a college campus. *See Robins v. Pruneyard Shopping Ctr.*, 23 *Cal.*3d 899, 153 *Cal.Rptr.* 854, 592 *P.*2d 341, 347 (1979), *aff'd*, 447 *U.S.* 74, 100 *S.Ct.* 2035, 64 *L.Ed.*2d 741 (1980); *Batchelder v. Allied Stores Int'l, Inc.*, 388 *Mass.* 83, 445 *N.E.*2d 590, 595 (1983). Those courts based their determinations, in part, on the open and public nature of the shopping mall. Further, the Supreme Court of Oregon, which originally found a constitutional right to engage in free speech and related activities, appears to have retreated from that position. *Stranahan v. Fred Meyer, Inc.*, 331 *Or.* 38, 11 *P.*3d 228, 243 (2000).

Many other states have declined to recognize a constitutional right to free speech in privately owned malls, largely on the ground that malls are not "state actors." *See Fiesta Mall Venture v. Mecham Recall Comm.*, 159 *Ariz.* 371, 767 *P.*2d 719, 723–24 (Ct.App.1988); *Cologne v. Westfarms Assocs.*, 192 *Conn.* 48, 469 *A.*2d 1201, 1209–10 (1984); *Citizens for Ethical Gov't, Inc. v. Gwinnett Place Assocs.*, 260 *Ga.* 245, 392 *S.E.*2d 8, 10 (1990); *Woodland v. Mich. Citizens Lobby*, 423 *Mich.* 188, 378 *N.W.*2d

337, 348 (1985); *SHAD Alliance v. Smith Haven Mall,* 66 *N.Y.*2d 496, 498 *N.Y.S.*2d 99, 488 *N.E.*2d 1211, 1217–18 (1985); *State v. Felmet,* 302 *N.C.* 173, 273 *S.E.*2d 708, 712 (1981); *Stranahan, supra,* 11 *P.*3d at 243; *W. Pa. Socialist Workers 1982 Campaign v. Conn. Gen. Life Ins. Co.,* 512 *Pa.* 23, 515 *A.*2d 1331, 1333 (1986); *Charleston Joint Venture v. McPherson,* 308 *S.C.* 145, 417 *S.E.*2d 544, 548 (1992); *Southcenter Joint Venture v. Nat'l Democratic Policy Comm.,* 113 *Wash.*2d 413, 780 *P.*2d 1282, 1291 (1989); *Jacobs v. Major,* 139 *Wis.*2d 492, 407 *N.W.*2d 832, 845–46 (1987).

We note also that, in the context of an apartment complex, the California Supreme Court modified its position in *Robins, supra,* and now requires state action before free speech rights will be recognized. *Golden Gateway Ctr. v. Golden Gateway Tenants Ass'n,* 26 *Cal.*4th 1013, 111 *Cal.Rptr.*2d 336, 29 *P.*3d 797, 803 (2001). In Golden Gateway Center, the plaintiff was the owner of a residential apartment complex. *Id.* 111 *Cal.Rptr.*2d 336, 29 *P.*3d at 799. The regulations for the complex banned all solicitation inside the building. *Ibid.* The tenants association claimed a right to distribute a newsletter and leaflets under the California Constitution's free speech clause. *Id.* 111 *Cal.Rptr.*2d 336, 29 *P.*3d at 800. The California Supreme Court noted that "state action" on the part of the apartment complex was a prerequisite to the tenants' free speech claim. *Id.* 111 *Cal.Rptr.*2d 336, 29 *P.*3d at 808. The court found that the apartment complex was privately owned and that access was restricted to tenants and their invitees. *Id.* 111 *Cal.Rptr.*2d 336, 29 *P.*3d at 810. Thus, the court held that the apartment complex was not the "functional equivalent of a traditional public forum" and was not a state actor for purposes of the application of California's free speech clause. *Ibid.*

In sum, the vast majority of other jurisdictions that have interpreted a state constitutional provision with language similar to our constitution's free speech provision require "state action" as a precondition to imposing constitutional obligations on private property owners. *See Id.* 111 *Cal.Rptr.*2d 336, 29 *P.*3d at 808; *see also Fiesta Mall Venture, supra,* 767 *P.*2d at 723 (holding that

state free speech clause did not restrain private conduct); *Cologne, supra,* 469 *A.*2d at 1209 (same); *Cahill v. Cobb Place Assocs.,* 271 *Ga.* 322, 519 *S.E.*2d 449, 450–51 (1999) (same); *People v. DiGuida,* 152 *Ill.*2d 104, 178 *Ill.Dec.* 80, 604 *N.E.*2d 336, 345 (1992) (same); *State v. Lacey,* 465 *N.W.*2d 537, 540 (Iowa 1991) (same); *Eastwood Mall, Inc. v. Slanco,* 68 *Ohio St.*3d 221, 626 *N.E.*2d 59, 61 (same), *cert. denied,* 513 *U.S.* 933, 115 *S.Ct.* 329, 130 *L.Ed.*2d 288 (1994); *Woodland, supra,* 378 *N.W.*2d at 348 (same); *State v. Wicklund,* 589 *N.W.*2d 793, 801 (Minn.1999) (same); *S.O.C., Inc. v. Mirage Casino–Hotel,* 117 *Nev.* 403, 23 *P.*3d 243, 251 (2001) (same); *SHAD Alliance, supra,* 498 *N.Y.S.*2d 99, 488 *N.E.*2d at 1215 (same); *W. Pa. Socialist Workers, supra,* 515 *A.*2d at 1335 (same); *Southcenter Joint Venture, supra,* 780 *P.*2d at 1291 (same); *Jacobs, supra,* 407 *N.W.*2d at 841 (same). Those courts recognize either explicitly or implicitly the principle that "the fundamental nature of a constitution is to govern the relationship between the people and their government, not to control the rights of the people vis-a-vis each other." *Southcenter Joint Venture, supra,* 780 *P.*2d at 1286 (footnote omitted).

## IV.

We concluded in *Schmid, supra,* that the rights of free speech and assembly under our constitution are not only secure from interference by governmental or public bodies, but under certain circumstances from the interference by the owner of private property as well. 84 *N.J.* at 559, 423 *A.*2d 615. Simply stated, we have not followed the approach of other jurisdictions to require some state action before the free speech and assembly clauses under our constitution may be invoked.

▆ With those general principles as a backdrop, we turn now to apply the *Schmid/Coalition* test to the present matter. As noted, our constitution's free speech provision is "broader than practically all others in the nation." *Green Party, supra,* 164 *N.J.* at 145, 752 *A.*2d 315. Consequently, we have not followed the approach of other jurisdictions to require some state action before

the free speech and assembly clauses under our constitution may be invoked. Even in the absence of state action, we must determine whether the acts of a homeowners' association violated its members' free speech and association rights in the setting of this private housing association.

■ This case presents an additional complication: it involves restrictions on conduct both on the private housing association's property and on the homeowners' properties. However, "[i]t is the extent of the restriction, and the circumstances of the restriction that are critical, not the identity of the party restricting free speech." *Coalition, supra,* 138 *N.J.* at 369, 650 *A.2d* 757. We conclude that the three-pronged test in *Schmid* and the general balancing of expressional rights and private property interests in *Coalition* are the appropriate standards to decide this case.

■ . As noted above, the *Schmid* test takes into account

(1) the nature, purposes, and primary use of such private property, generally, its "normal" use, (2) the extent and nature of the public's invitation to use that property, and (3) the purpose of the expressional activity undertaken upon such property in relation to both the private and public use of the property.

[*Id.* at 563, 423 *A.2d* 615.]

The first *Schmid* factor requires that we consider the nature, purposes, and primary use of the property. Twin Rivers is a common interest community "in which the property is burdened by servitudes requiring property owners to contribute to maintenance of commonly held property or to pay dues or assessments to an owners association that provides services or facilities to the community." *Restatement (Third) of Property: Servitudes* § 6 (2000). We have recognized that "[a] common-interest community is distinguishable from any other form of real property ownership because 'there is a commonality of interest, an interdependence directly tied to the use, enjoyment, and ownership of property.'" *Fox v. Kings Grant Maint. Ass'n,* 167 *N.J.* 208, 222, 770 *A.2d* 707 (2001) (quoting Wayne S. Hyatt, *Condominium and Homeowner Association Practice: Community Association Law* § 2.01 at 25 (2d ed.1988)).

The primary use of the property in Twin Rivers is residential. There are privately owned businesses within the borders of Twin Rivers, but the Association derives no revenue from them. East Windsor Township, not Twin Rivers, provides for the school system, the police and fire departments, the municipal court system, and the first aid services. Twin Rivers offers its residents services in the form of landscape maintenance, upkeep of trust-owned roads, removal of trash from certain sections of the community, and cleaning of snow. Thus, we find the nature, purposes, and primary use of Twin Rivers's property is for private purposes and does not favor a finding that the Association's rules and regulations violated plaintiffs' constitutional rights.

The second *Schmid* factor requires that we examine the extent and nature of the public's invitation to use the property. A public invitation to use the premises may be express or implied. As we explained in *Coalition, supra,* an implied invitation can be inferred where the property owner permits and encourages public use of the property. 138 *N.J.* at 356, 650 *A.*2d 757. Here, the Association has not invited the public to use its property. Although Twin Rivers is not a gated community and its roads are accessible to public traffic, we agree with the Association's position that "Trust-owned property and facilities are for the exclusive use of Twin Rivers residents and their invited guests." Moreover, the mere fact that owners may sell or rent property to members of the public who are invited to come into Twin Rivers and inspect such property hardly implicates a public invitation. We conclude that the limited nature of the public's invitation to use the property does not favor a finding that the Association's rules and regulations violated plaintiffs' constitutional rights.

The third *Schmid* factor concerns the purpose of the expressional activity in relation to both the private and public use of the property. This part of the test requires that we examine "the compatibility of the free speech sought to be exercised with the uses of the property." *Id.* at 361, 650 *A.*2d 757. Essentially, we must look to the fairness of the restrictions imposed by the

Association in relation to plaintiffs' free speech rights. In this case, plaintiffs' expressional activities—posting political signs, free use of the community room, and access to the community newspaper—involve political-like speech aimed at affecting the manner in which Twin Rivers is managed.

We find that plaintiffs' expressional activities are not unreasonably restricted. As the Association points out, the relationship between it and the homeowners is a contractual one, formalized in reasonable covenants that appear in all deeds. Moreover, unlike the university in *Schmid*, and the shopping center in *Coalition*, Twin Rivers is not a private forum that invites the public on its property to either facilitate academic discourse or to encourage public commerce. Rather, Twin Rivers is a private, residential community whose residents have contractually agreed to abide by the common rules and regulations of the Association. The mutual benefit and reciprocal nature of those rules and regulations, and their enforcement, is essential to the fundamental nature of the communal living arrangement that Twin Rivers residents enjoy. We further conclude that this factor does not weigh in favor of finding that the Association's rules and regulations violated plaintiffs' constitutional rights.

We are mindful that at least in regard to the signs on the property of the homeowners, it is the private homeowner's property and not that of the Association that is impacted. The private property owner not only is "protected under due process standards from untoward interference with or confiscatory restrictions upon its reasonable use," *Schmid, supra*, 84 *N.J.* at 561, 423 *A.2d* 615, but also our constitution affirmatively grants the homeowner free speech and assembly rights that may be exercised on that property. Notably, the Association permits expressional activities to take place on plaintiffs' property but with some minor restrictions. Homeowners are permitted to place a single sign in each window and signs may be placed in the flower beds adjacent to the homes. Those limitations are clearly not an "untoward interfer-

ence with" or a "confiscatory restriction" on the reasonable use by plaintiffs' on their property to implicate due process standards.

The outcome of the balancing of the expressional rights and the privacy interests is obvious. "We do not interfere lightly with private property rights." *Coalition, supra,* 138 *N.J.* at 371, 650 *A.*2d 757. We find that the minor restrictions on plaintiffs' expressional activities are not unreasonable or oppressive, and the Association is not acting as a municipality. The Association's restrictions concerning the placement of the signs, the use of the community room, and access to its newspaper are reasonable "concerning the time, place, and manner of" such restrictions. *See Id.* at 362, 650 *A.*2d 757. Neither singularly nor in combination is the *Schmid/Coalition* test satisfied in favor of concluding that a constitutional right was infringed here. Consequently, we conclude that in balancing plaintiffs' expressional rights against the Association's private property interest, the Association's policies do not violate the free speech and right of assembly clauses of the New Jersey Constitution.

Additionally, plaintiffs have other means of expression beyond the Association's newspaper. Plaintiffs can walk through the neighborhood, ring the doorbells of their neighbors, and advance their views. As found by the trial court, plaintiffs can distribute their own newsletter to residents, and have done so. As members of the Association, plaintiffs can vote, run for office, and participate through the elective process in the decision-making of the Association. Thus, plaintiffs may seek to garner a majority to change the rules and regulations to reduce or eliminate the restrictions they now challenge.

## V.

We recognize the concerns of plaintiffs that bear on the extent and exercise of their constitutional rights in this and other similar common interest communities. At a minimum, any restrictions on the exercise of those rights must be reasonable as to time, place, and manner. Our holding does not suggest, however, that

residents of a homeowners' association may never successfully seek constitutional redress against a governing association that unreasonably infringes their free speech rights.

Moreover, common interest residents have other protections. First, the business judgment rule protects common interest community residents from arbitrary decision-making. *See Thanasoulis v. Winston Towers 200 Ass'n, Inc.*, 110 *N.J.* 650, 666, 542 *A.*2d 900 (1988) (Garibaldi, J., dissenting in part and concurring in part). That is, a homeowners' association's governing body has "a fiduciary relationship to the unit owners, comparable to the obligation that a board of directors of a corporation owes to its stockholders." *Siller v. Hartz Mountain Assocs.*, 93 *N.J.* 370, 382, 461 *A.*2d 568, *cert. denied*, 464 *U.S.* 961, 104 *S.Ct.* 395, 78 *L.Ed.*2d 337 (1983). Pursuant to the business judgment rule, a homeowners' association's rules and regulations will be invalidated (1) if they are not authorized by statute or by the bylaws or master deed, or (2) if the association's actions are "fraudulent, self-dealing or unconscionable." *Owners of the Manor Homes of Whittingham v. Whittingham Homeowners Ass'n*, 367 *N.J.Super.* 314, 322, 842 *A.*2d 853 (App.Div.2004) (citation omitted); *see, e.g., Siller, supra*, 93 *N.J.* at 382, 461 *A.*2d 568. Our Appellate Division has uniformly invoked the business judgment rule in cases involving homeowners' associations. *See, e.g., Whittingham, supra*, 367 *N.J.Super.* at 322, 842 *A.*2d 853; *Walker v. Briarwood Condo Ass'n*, 274 *N.J.Super.* 422, 426, 644 *A.*2d 634 (App.Div.1994); *see also Mulligan v. Panther Valley Prop. Owners Ass'n*, 337 *N.J.Super.* 293, 299–300, 766 *A.*2d 1186 (App.Div. 2001) (discussing application of the business judgment rule).

Second, residents are protected by *N.J.S.A.* 45:22A–44 of the PREDFDA, which provides:

Powers and duties of associations

a. Subject to the master deed, declaration of covenants and restrictions or other instruments of creation, the association may do all that it is legally entitled to do under the laws applicable to its form of organization.

b. *The association shall exercise its powers and discharge its functions in a manner that protects and furthers the health, safety and general welfare of the residents of the community.*

c. The association shall provide a fair and efficient procedure for the resolution of disputes between individual unit owners and the association, and between unit owners, which shall be readily available as an alternative to litigation.

[ (Emphasis added).]

Although we have not yet had the opportunity to interpret *N.J.S.A.* 45:22A–44, restrictive covenants established by homeowners' associations that unreasonably limit speech and association rights could be challenged under subsection (b) of the statute.

 Finally, residents are protected under traditional principles of property law—principles that specifically account for the rights afforded under our constitution's free speech and association clauses. Our courts have recognized that restrictive covenants on real property that violate public policy are void as unenforceable. *See, e.g., Clarke v. Kurtz*, 123 *N.J. Eq.* 174, 178, 196 *A.* 727 (E. & A.1938) ("The equitable grounds on which restrictions of this nature may be enforced at the instance of a subsequent grantee of the common grantor are well defined. One owning a tract of land may convey a portion of it, and by appropriate covenant or agreement may lawfully restrict the use of the part conveyed for the benefit of the unsold portion, *providing that the nature of the restricted use is not contrary to principles of public policy.*") (quotations omitted) (emphasis added)); *Courts at Beachgate v. Bird*, 226 *N.J.Super.* 631, 639, 545 *A.*2d 243 (Ch.Div.1988) (noting that "[r]estrictions in a master deed" should be enforced "unless those provisions 'are wholly arbitrary in their application, in violation of public policy, or that they abrogate some fundamental constitutional right'" (citation omitted)).

In *Davidson Bros. v. D. Katz & Sons, Inc.*, we enumerated the factors that courts should consider in determining whether restrictive covenants are "reasonable," and thus enforceable:

1. *The intention of the parties when the covenant was executed, and whether the parties had a viable purpose which did not at the time interfere with existing commercial laws, such as antitrust laws, or public policy.*

2. Whether the covenant had an impact on the considerations exchanged when the covenant was originally executed. . . .

3. Whether the covenant clearly and expressly sets forth the restrictions.

4. Whether the covenant was in writing, recorded, and if so, whether the subsequent grantee had actual notice of the covenant.

5. Whether the covenant is reasonable concerning area, time or duration. . . .

6. Whether the covenant imposes an unreasonable restraint on trade or secures a monopoly for the covenantor. . . .

7. *Whether the covenant interferes with the public interest.*

8. Whether, even if the covenant was reasonable at the time it was executed, "changed circumstances" now make the covenant unreasonable.

[121 *N.J.* 196, 211–12, 579 *A.*2d 288 (1990) (emphasis added) (citations omitted); *see Acme Markets, Inc. v. Wharton Hardware & Supply Corp.,* 890 *F.Supp.* 1230, 1242 (D.N.J.1995) (identifying *Davidson Bros.'s* test for determining "Validity of the Restrictive Covenant Under New Jersey Law").]

▉ Our constitution and the fundamental rights it protects play a pivotal role in evidencing public policy. *See, e.g., Mulhearn v. Fed. Shipbuilding & Dry Dock Co.,* 2 *N.J.* 356, 360, 66 *A.*2d 726 (1949) (noting that public policy is "evidenced" by the New Jersey Constitution and statutes); *Vargo v. Nat'l Exch. Carriers Ass'n,* 376 *N.J.Super.* 364, 377, 870 *A.*2d 679 (App.Div.2005) ("Sources of public policy include the constitution," statutes, administrative rules, regulations and judicial decisions."); *Baylor v. N.J. Dep't of Human Servs.,* 235 *N.J.Super.* 22, 46, 561 *A.*2d 618 (App.Div.1989) ("Evidentiary sources of public policy include federal and state constitutions and constitutionally valid legislation." (citations omitted)), *aff'd,* 127 *N.J.* 286, 604 *A.*2d 110 (1990). Indeed, in *Hennessey v. Coastal Eagle Point Oil Co.,* 129 *N.J.* 81, 93, 609 *A.*2d 11 (1992), we found that in New Jersey, the "highest source of public policy" is our constitution. Thus, restrictive covenants that unreasonably restrict speech—a right most substantial in our constitutional scheme—may be declared unenforceable as a matter of public policy.

## VI.

The judgment of the Appellate Division is reversed and we reinstate the judgment of the trial court.

*For reversal and reinstatement*—Chief Justice ZAZZALI and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.