**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4057-23

AMHERST FARMS
HOMEOWNERS
ASSOCIATION, INC.,

     Plaintiff-Respondent,

v.

D.M. and L.S.,[1]

     Defendants-Appellants.

_____

       Submitted December 9, 2025 – Decided December 19, 2025

       Before Judges Gilson and Perez Friscia.

       On appeal from the Superior Court of New Jersey, Chancery Division, Gloucester County, Docket No. C-000046-22.

       Kristina Bergsten (The Animal Law Firm), attorney for appellant.

       McInerney Coughlin & Schmidt, LLC, and Marshall Dennehey, PC, attorneys for respondent (John J.

---

[1] Because this opinion discusses confidential medical issues about L.S., we use initials to protect her privacy. R. 1:38-3(a)(2).

Coughlin, Matthew J. Behr, and Walter F. Kawalec, III, on the brief).

PER CURIAM

Defendants D.M. and L.S. appeal from the July 16, 2024 Chancery Division order, which granted plaintiff Amherst Farms Homeowners Association, Inc.'s summary judgment motion on its declaratory judgment claim and dismissed defendants' counterclaims for fraud, intentional infliction of emotional distress, malicious use of process, violations of the Fair Housing Act (FHA), 42 U.S.C. § 3601 to § 3619, and violations of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -50. Defendants also appeal from the denial of their summary judgment motion on their counterclaims and to dismiss plaintiff's claim. Having reviewed the record, parties' arguments, and applicable law, we affirm.

I.

We derive the material facts and procedural history from the record. In reviewing the cross-motions for summary judgment de novo, we view the facts established in the record in the light most favorable to the non-moving parties and determine if the moving party is entitled to a judgment as a matter of law. See N.J. Coal. of Auto. Retailers, Inc. v. Ford Motor Co., 261 N.J. 348, 357-58 (2025).

2

Plaintiff is the homeowners' association for a planned community of 184 luxury homes in Mickleton.  The homes are on one-half-acre lots with shared amenities and designated common property.  Plaintiff is administered by a volunteer board of trustees (Board), and the community is subject to governing documents, including a Declaration of Covenants and Restrictions (the Declaration) and Bylaws.  Declaration Section 15.03 authorizes plaintiff to enforce the governing documents "by an appropriate proceeding in law or equity in any court."

In 2020, D.M. purchased a residential property in the community to live with L.S.  As a property owner and resident in the community, D.M. and L.S. are subject to plaintiff's Declaration and Bylaws.  The Declaration under Section 13.01(l) provides a limitation on pets that are permitted and states that:

> No animals of any kind shall be bred in any Unit. No animals other than domestic animals, such as dogs or cats as household pets . . . shall [be] permit[ted]. Hamsters, birds, reptiles, amphibians[,] and/or fish may be kept as household pets in any [u]nit, provided that such permitted species are not kept for any commercial purposes, do not constitute a nuisance to others[,] and are kept in strict accordance with any rules and regulations relating to household pets which may be promulgated by the Board.

A-4057-23

Further, the Declaration requires homeowners to obtain Board approval before making any exterior property improvements. Declaration Section 14.01 provides that plaintiff has "Architectural Control" and:

> . . . No building, or other such improvement, shall be commenced, erected[,] or maintained upon any Unit, nor shall any exterior addition to or change or alteration be made to any Unit . . . until the . . . proposed [i]mprovements . . . have been submitted to and approved in writing by the architectural design review committee.

Shortly after moving into the home in 2020, L.S. and her mother met a Board member, John Lucian, outside and spoke about having chickens and a coop in their backyard. Lucian discussed having chickens with "approval from their neighbors." Lucian recalled the "casual" conversation differently than L.S. but remembered advising her to consult with neighbors as there may be different views on having chickens.

Two years later, in about April 2022, defendants purchased six chickens and thereafter constructed a backyard coop and run. After defendants informed Lucian and another board member about their chickens, plaintiff requested they remove the chickens, coop, and run. In response, defendants provided a signed letter from four neighbors indicating "[w]e the direct neighbors . . . have granted our permission and full support." On May 4, plaintiff rejected defendants'

4

A-4057-23

request for "a chicken coop and [to] keep chickens in [their] backyard[,] citing violations of the . . . Declarations."  On May 5, defendants, citing the FHA, requested "reasonable accommodations for the chickens" as L.S.'s "emotional support animals (ESAs)" and the "outdoor coop and enclosed run."  Defendants also alleged they relied on Lucian's statements made two years earlier.  Defendants later reviewed plaintiff's website's frequently asked questions (FAQ) page and allegedly relied on a sentence stating that no architectural committee approval was necessary for any improvements if immediate neighbors consented.

On May 25, the Board informed defendants that the chickens and coop violated the Declaration and rejected defendants' FHA accommodation request.  The Board found defendants provided insufficient documentation on the following:  L.S.'s disability; the chickens were ESAs providing "therapeutic emotional support with respect to . . . [L.S.'s] disability"; and the chickens met "the definition of an animal commonly kept in [the] household."

On June 6, defendants submitted to the Board letters from L.S.'s treating internist, Celeste Mruk, M.D., and therapist, Janice S. Dugan-Roller, Ph.D., recommending the chickens as ESAs for L.S.  Dr. Mruk's letter stated that the chickens "assist [L.S.] in coping with her symptoms which affect one or more

major life activities" and that L.S. "has six female chickens[,] each of whom provide her with unique individual emotional support and significant relief from her symptoms." Dr. Dugan-Roller's letter stated that "L.S.'s relationship with her [ESAs] (in this case poultry) initially made a substantial decrease in stress levels, reduced panic, and increased management of her anxiety."

On June 20, plaintiff rejected defendants' renewed accommodation request for L.S., finding she failed to meet the substantial burden of demonstrating the "unique" chickens provided a disability-related therapeutic need that was specific to the type of animal. Plaintiff highlighted L.S.'s documentation was deficient and referenced that Dr. Mruk failed to demonstrate sufficient knowledge of chickens as ESAs and opine there was any "therapeutic need for the chickens." Regarding Dr. Dugan-Roller, the Board determined her letter similarly "fail[ed] to meet the substantial burden of demonstrating a unique disability-related therapeutic need for the specific" chickens. The Board rejected defendants' accommodation request as no documentation demonstrated that six chickens were necessary. It stated the denial was based on the following: the "change of the character of the community"; "chickens will attract wild animals – raccoons, fox[es], [and] coyotes"; and "health issues." Defendants were told to cure the Declaration violations within twenty days.

6

A-4057-23

Thereafter, plaintiff offered defendants the option of removing five chickens and retaining one caged chicken outside, along with the coop and run that was fenced in. Defendants denied the offer.

After defendants failed to comply with the Declaration's pet limitation, plaintiff filed a declaratory judgment complaint, on September 29, requesting injunctive relief for the removal of the chickens, coop, and run. Plaintiff also requested compensatory damages and that defendants be fined until they complied. Regarding the alleged Declaration violations, plaintiff posited defendants failed to obtain the architectural committee's approval for their chicken coop improvement and retained prohibited pets. Plaintiff represented that "many neighbors d[id] not approve of the chickens, coop, or run" and that some of the neighbors that signed defendants' initial support letter had indicated they "did so to avoid disagreement or discomfort with [d]efendants."

On December 1, defendants filed an answer and counterclaims. They alleged claims of discrimination under the FHA, fraud, intentional infliction of emotional distress, and malicious use of process. Defendants alleged that L.S. "is a handicapped person as defined by the [FHA]," the "chickens are ESAs," and that she needed the chickens "to use and enjoy her dwelling and her life." In addition to alleging reliance on Lucian's comments and plaintiff's website's

A-4057-23

FAQ, defendants averred plaintiff's "harassment" and "denial of their reasonable accommodation requests [we]re so outrageous as to be regarded as atrocious and utterly intolerable."

During discovery, plaintiff's interrogatories requested defendants name their experts and serve the experts' reports. Defendants only named Gwenne Baile, a registered nurse, as an expert "to testify on . . . the care, maintenance, and upkeep of chickens, and on the therapeutic effects of chickens on persons suffering from anxiety, depression, PTSD, etc." Defendants did not provide Baile's resume or an expert report but summarized her qualifications and observations. Baile had observed the coop, chickens, and defendants' care of the chickens. The summary had a couple of sentences on the therapeutic relief chickens provide generally but did not address L.S.'s disability. Defendants relied on L.S.'s two treating medical providers' letters in support of her requested accommodation.

During L.S.'s deposition, she relayed having anxiety and PTSD. She had not "plan[ned] for the[ chickens] to be [ESAs]." L.S. recalled the brief conversation with Lucian as a Board member, and his indication that chickens were permitted with "immediate neighbors' permission." Because she believed chickens were permitted, after a conversation with a "good friend who[ is] . . . a

chicken farmer," she purchased the six chickens thinking "it would be . . . a good experience." She initially cared for them inside and named them Bertha, Gertrude, Mildred, Ginger, Rosie, and Flo. Defendants have also had in their home "two dogs, two fish, and two domestic guinea pigs." When explaining the chickens' assistance, L.S. explained the following: she would "sit with them, pet them, [and] they would peck [her] hands"; they provide a very soothing, "soft auditory response"; she enjoyed "watching them interact with each other"; and their "expressive . . . personalities" made her laugh. L.S. relayed that feeding the chickens "really calm[ed] down some of the symptoms." She noted another neighbor had chickens. She also acknowledged refusing plaintiff's offer to "keep one [chicken], in a small coop" if she removed the other five chickens.

L.S. further recognized understanding that associations in community residences have "bylaws and covenants of restrictions." In a townhouse community where L.S. previously resided, she was on a homeowners' association board and served as the president.

After the completion of discovery, on January 16, 2024, plaintiff moved for summary judgment on its complaint and to dismiss defendants' counterclaims. On the same day, defendants cross-moved for summary judgment on their counterclaims and to dismiss plaintiff's complaint. After

briefing, the parties filed supplemental briefs addressing the Supreme Court's decision in Players Place II Condo. Ass'n, Inc. v. K.P., 256 N.J. 472 (2024).

The trial court heard argument and reserved its decision. On April 16, defendants moved to amend to add an LAD counterclaim. Plaintiff opposed the motion, arguing a late amendment would be improper after discovery was completed and summary judgment motions were argued. After further argument, the court again reserved its decision.

On July 16, the court issued an order accompanied by a thirty-five-page written opinion, which granted plaintiff summary judgment on its complaint, dismissed defendants' counterclaims, and denied defendants' cross-motion with prejudice. The court granted defendants' motion to amend their counterclaim to an LAD claim, but then held that plaintiff was entitled to summary judgment on the LAD claim. Defendants were ordered to remove the chickens and the coop within forty-five days. The court determined plaintiff had standing and the authority to file its action. The court noted defendants are subject to the Declaration and Bylaws, which expressly granted plaintiff enforcement powers. The court found plaintiff was "entitled to judgment as a matter of law" and noted that the "finding, however, depend[ed] upon the [c]ourt's analysis of the counterclaims by the [d]efendants."

A-4057-23

In reviewing defendants' counterclaims, the court viewed the facts in the light most favorable to defendants. It first found defendants' fraud counterclaim warranted dismissal, because plaintiff did not intend for defendants to rely on Lucian's "informal conversation," and it was not reasonable for defendants to have relied on his statements as binding. The court also dismissed defendants' intentional infliction of emotional distress counterclaim because the facts did not demonstrate any outrageous action. The court dismissed the malicious use of process counterclaim, finding "no evidence that the complaint was filed" with "an ulterior purpose."

The court rejected defendants' FHA counterclaim and noted the amended LAD counterclaim would similarly be denied under the same "analysis for . . . summary judgment." The court noted it was "unable to find any . . . law" that chickens qualify as ESAs under either the FHA or LAD and that defendants failed to meet their burden of establishing chickens were ESAs. It further determined "there [wa]s not a scintilla of evidence to substantiate how a total of six chickens provide[d] defendant with the disability related therapeutic effect." The court also referenced the Housing and Urban Development (HUD) guidance, quoting that "there are 'very rare circumstances' where an accommodation must be provided" if the "animal is 'not commonly kept in

A-4057-23

households.'"[2]  The court found that there was "no evidence how the outdoor chickens allow[ed] [L.S.] to enjoy the residence as a non-disabled person could."

On appeal, defendants argue reversal is warranted because the court committed the following errors:  (1) evaluating defendants' discrimination claims last; (2) "fail[ing] to analyze [L.S.] under a reasonable disabled person standard"; (3) finding plaintiff met the "very high burden under" requests for declaratory judgment and injunctive relief; (4) ignoring that "[plaintiff] admitted that Lucian's informal advice on obtaining chickens was standard practice and intended to be relied upon"; and (5) using the standard for malicious abuse of process and malicious prosecution, which defendants never pled.

II.

Our review of a trial court's summary judgment decision is de novo. DeSimone v. Springpoint Senior Living, Inc., 256 N.J. 172, 180 (2024); see also

---

[2]  HUD Guidance: Assessing a Person's Request to Have an Animal as a Reasonable Accommodation Under the Fair Housing Act, at 1 (Jan. 28, 2020), https://www.fairhousingnc.org/wp-content/uploads/2020/01/HUDAsstAnimalNC1-28-2020.pdf [hereinafter HUD Guidance].  While the parties agreed the HUD Guidance applied at the time of defendants' requested accommodation, we note that on September 17, 2025, HUD announced the withdrawal of the HUD Guidance.  Memorandum from John Gibbs, Principal Deputy Assistant Sec'y, to Off. of Fair Hous. & Equal Opportunity (Sept 17, 2025), https://www.hud.gov/sites/dfiles/Main/documents/Notice-of-Withdrawal-of-Guidance-Documents.pdf.

R. 4:46-2(c). "The court's function is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Rios v. Meda Pharm., Inc., 247 N.J. 1, 13 (2021) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)). "A dispute of material fact is 'genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.'" Gayles by Gayles v. Sky Zone Trampoline Park, 468 N.J. Super. 17, 22 (App. Div. 2021) (quoting Grande v. Saint Clare's Health Sys., 230 N.J. 1, 24 (2017)).

"Summary judgment should be granted 'if the discovery and any affidavits show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" DeSimone, 256 N.J. at 180-81 (quoting Perez v. Professionally Green, LLC, 215 N.J. 388, 405 (2013)) (internal quotation marks omitted). Insubstantial arguments based on assumptions or speculation are not enough to overcome summary judgment. Brill, 142 N.J. at 529; see also Dickson v. Cmty. Bus Lines, Inc., 458 N.J. Super. 522, 533 (App. Div. 2019) ("'[C]onclusory and self-serving

assertions by one of the parties are insufficient to overcome' a motion for summary judgment." (quoting Puder v. Buechel, 183 N.J. 428, 440-41 (2005))).

III.

A. Fair Housing Act and Law Against Discrimination.

Defendants contend the court erroneously granted plaintiff's summary judgment motion to dismiss their FHA and LAD counterclaims. Specifically, defendants argue the court erred: in addressing plaintiff's declaratory judgment claim and applying the business judgment rule before addressing the FHA and LAD; framing the issue as to "whether chickens qualify as [ESAs] . . . under the FHA and LAD"; finding L.S. failed to meet her burden despite submitting "disability documentation," which demonstrated the chickens mitigated her PTSD symptoms and permitted her to comfortably live in her home; and determining plaintiff met its burden of showing an accommodation was an undue financial or administrative burden. After reviewing the record, we conclude under the FHA and LAD that defendants failed to show a genuine material issue of fact supporting that the six chickens ameliorate L.S.'s disability and afford her an equal opportunity to use her home.

The FHA was enacted to address discrimination and provide fair housing. See 42 U.S.C. § 3601. Further, the FHA is "a clear pronouncement of a national

14

commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream." Hovsons, Inc. v. Township of Brick, 89 F.3d 1096, 1105 (3d Cir. 1996) (emphasis and citations omitted).

Under the FHA, it is unlawful to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap." 42 U.S.C. § 3604(f)(1). A "dwelling" is broadly defined under 42 U.S.C. § 3602(b) as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof." "[D]iscrimination includes . . . a refusal to permit, at the expense of the handicapped person, reasonable modifications of existing premises occupied or to be occupied by such person if such modifications may be necessary to afford such person full enjoyment of the premises." 42 U.S.C. § 3604(f)(3)(A). The FHA's definition of handicap includes a "mental impairment which substantially limits one or more of such person's major life activities." 42 U.S.C. § 3602(h)(1). Discrimination also occurs when a defendant "refus[es] to make reasonable accommodations . . . when such accommodations may be necessary

to afford such person equal opportunity to use and enjoy a dwelling."  42 U.S.C. § 3604(f)(3)(B).

The LAD similarly prohibits housing discrimination based on a person's disability.  N.J.S.A. 10:5-12(g)(2).  "It is well-established that the LAD is intended to . . . remedy . . . unacceptable discrimination and is to be construed liberally."  Est. of Nicolas v. Ocean Plaza Condo. Ass'n, Inc., 388 N.J. Super. 571, 587 (App. Div. 2006) (quoting Franek v. Tomahawk Lake Resort, 333 N.J. Super. 206, 217 (App. Div. 2000)).  Our Supreme Court has recognized that "[t]he LAD . . . defines 'disability' more broadly than the FHA."  Players Place II, 256 N.J. at 489.  Under the LAD, disability includes "any mental, psychological, or developmental disability, . . . which [1] prevents the typical exercise of any bodily or mental functions or [2] is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques."  N.J.S.A. 10:5-5(q).  Further, it is "unlawful discrimination" to "discriminate against any person . . . because of . . . [a] disability . . . in the terms, conditions or privileges of the sale, rental or lease of any real property . . . or in the furnishing of facilities or services in connection therewith."  N.J.S.A. 10:5-12(g)(2).

16

"The Division on Civil Rights . . . in the Department of Law and Public Safety is empowered 'to prevent and eliminate discrimination' under the LAD." Players Place II, 256 N.J. at 488 (quoting N.J.S.A. 10:5-6, -9.1). To protect people with disabilities, the Division on Civil Rights promulgated N.J.A.C. 13:13-3.4(f)(2), which states:

> It is unlawful for any person to . . . [r]efuse to make reasonable accommodations in rules, policies, practices or services, or reasonable structural modifications, when such accommodations or modifications may be necessary to afford a person with a disability equal opportunity to use and enjoy a dwelling, including public and common areas.

Our Supreme Court has recognized under the FHA and LAD that an individual seeking an accommodation bears the initial burden of showing (1) a disability and (2) that "the requested accommodation 'was necessary to afford him [or her] . . . an equal opportunity to use and enjoy a dwelling.'" Players Place II, 256 N.J. at 472 (quoting Oras v. Hous. Auth. of Bayonne, 373 N.J. Super. 302, 312 (App. Div. 2004)); see also Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Scotch Plains, 284 F.3d 442, 457 (3d Cir. 2002).

Once the applicant satisfies the two accommodation elements, "[t]he burden of proof then shifts to the housing provider 'to show that the requested accommodation is or was unreasonable.'" Id. at 490 (quoting Oras, 373 N.J.

Super. at 312). An Association "[i]s 'obligated to accommodate' the [resident]'s 'disability "to the extent necessary to provide the handicapped person with an opportunity to use and occupy the dwelling unit equal to a non-handicapped person."'" Ibid. (quoting Oras, 373 N.J. Super. at 314). Our Supreme Court has held a "reasonable accommodation may include the use of an ESA, 'despite the existence of a rule . . . prohibiting such an animal.'" Id. at 491 (quoting Revock v. Cowpet Bay W. Condo. Ass'n, 853 F.3d 96, 100 (3d Cir. 2017)).

HUD's guidance document provided the "best practices for housing providers to comply with the FHA as they assess 'requests for reasonable accommodations to keep animals in housing.'" Id. at 491-92 (quoting HUD Guidance at 1). The HUD Guidance explained that permitted animals included those that "provide[d] therapeutic emotional support for individuals with disabilities" and "alleviate[d] at least one identified symptom or effect of a physical or mental impairment." HUD Guidance at 3, 19.

In addressing the "obligations of housing providers under the . . . [FHA] with respect to animals that individuals with disabilities may request," the HUD Guidance specifically addressed the "[t]ype of animals" that may be considered. Id. at 1. The HUD Guidance addressed "animals commonly kept in households" and "[u]nique animals." Id. at 12. "[B]arnyard . . . and other non-domesticated

animals [we]re not considered common household animals." Ibid. In seeking an accommodation for a unique animal, the HUD Guidance explained that "the requestor ha[d] the substantial burden of demonstrating a disability-related therapeutic need for the specific animal or the specific type of animal." Ibid. (emphasis added). "The individual [wa]s encouraged to submit documentation from a health care professional confirming the need for th[e] animal, which include[d] information of the type set out in the Guidance on Documenting an Individual's Need for Assistance Animals in Housing." Ibid. (emphasis added). The HUD Guidance recognized "[o]ne reliable form of documentation [wa]s a note from a person's health care professional that confirm[ed] a person's disability and/or need for an animal when the provider has personal knowledge of the individual." Id. at 11 (emphasis added). "[T]he lack of such documentation in many cases [was considered] reasonable grounds for denying a requested accommodation." Id. at 12. The HUD Guidance also clarified that "[r]easonable accommodations [could] be necessary when the need for a unique animal involve[d] unique circumstances" and that an individual could "seek[] to keep the animal outdoors at a house with a fenced yard where the animal can be appropriately maintained." Id. at 13.

Against this legal backdrop, we address defendants' contentions. It is undisputed defendants have the initial burden of demonstrating L.S.'s disability. Providing defendants with all permissive inferences, we accept that L.S. has established under the first element that she suffers from anxiety and PTSD. Therefore, the crux of the issue on appeal is whether L.S. has shown a disputed material issue of fact under the second element—that the six chickens are therapeutic and ameliorate her disability, affording her an "equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(A); N.J.A.C. 13:13-3.4(f)(2).

Under the second element, the parties agree chickens are considered "unique animals," but they disagree on whether chickens may serve as ESAs. The court found no support exists for a general determination that "chickens are [ESAs]." We part ways with the court's determination and agree with defendants that a chicken may qualify as an ESA under the HUD Guidance, which recognized that unique animals may serve "a disability-related therapeutic need." HUD Guidance at 12. Thus, we do not foreclose that a chicken could qualify as an ESA. However, the HUD Guidance clearly recognized that a person seeking an accommodation must establish the need for the specific

A-4057-23

unique animal, which is best done by submitting "documentation from a health care professional" unless provable through other means.[3]  Ibid.

Defendants acknowledge they have the "substantial burden" to prove that L.S. should be accommodated for six chickens and must show how each unique chicken is necessary for her equal enjoyment of the residence.  While we agree that ESAs, whether common household or unique animals, provide a wide range of assistance to people with disabilities, L.S.'s assertion alone that she needs all six chickens to therapeutically ameliorate her disability is insufficient to satisfy defendants' burden.  As recognized by the HUD Guidance, the therapeutic disability related issues are not within common knowledge.  Further, it is undisputed that defendants' failure to produce objective "documentation" is a "reasonable ground[] for denying a requested accommodation" of a unique animal.  Id. at 12.  Thus, we turn to review the court's determination regarding

---

[3] We note the HUD Guidance provided as an example of an "individually trained capuchin monkey" that qualified as a unique ESA because it "perform[ed] tasks for a person with paralysis" such as "retriev[ing] a bottle of water from the refrigerator, unscrew[ing] the cap, insert[ing] a straw, and plac[ing] the bottle in a holder so the individual can get a drink of water." Id. at 13. While generally a medical expert's opinion is required, we are not convinced that in narrow circumstances a court could discern, without an expert's opinion, that a specific animal is an ESA.

A-4057-23

her medical professional's opinions to discern if defendants have offered documented support creating a factual dispute.

"The admission or exclusion of expert testimony is committed to the sound discretion of the trial court." Townsend v. Pierre, 221 N.J. 36, 52 (2015). "The net opinion rule is a 'corollary of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" Id. at 53-54 (alteration and omission in original) (quoting Polzo v. County of Essex, 196 N.J. 569, 583 (2008)). Experts are required to "give the why and wherefore that supports the opinion, rather than a mere conclusion." Id. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)) (internal quotation marks omitted). They must "be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable." Id. at 55 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)).

Defendants proffer Baile as an expert, but defense counsel conceded during oral argument that Baile could "not specifically" testify to the chickens' therapeutic effect "with [L.S.]" Baile's opinion did not review L.S.'s medical history nor specifically assess L.S.'s disability and the six chickens' therapeutic

22

effects on L.S.'s use and enjoyment of the residence. Rather, Baile's opinion addressed chickens as ESAs based on their possible "therapeutic effects . . . on persons suffering from anxiety, depression, [and] PTSD."

After reviewing defendants' two medical professionals' letters, we discern no error in the court's determination that their letter opinions were "net opinions" because "the 'whys' and the 'wherefores' [we]re not sufficiently nor adequately addressed." Dr. Mruk's six-sentence letter fails to explain how the six chickens "provide [L.S.] with unique and individual emotional support and significant relief." Additionally, Dr. Dugan-Roller's assertion that L.R.'s "relationship with her . . . [ESAs] (in this case poultry) initially made a substantial decrease in stress levels, reduced panic and increased management of anxiety" has no foundational support and analysis. Defendants failed to offer a medical professional's opinion that reviewed and evaluated L.S.'s diagnoses, treatment, and specific ESA disability-related services. Further, the opinions did not address any "unique circumstances justifying the patient's need for the particular" chickens. HUD Guidance at 17. L.S. failed to demonstrate a material issue of fact that the six chickens should be accommodated in defendants' backyard because each chicken satisfies a "therapeutic need." HUD Guidance at 12. For these reasons, we discern no reason to disturb the court's

23

determination that defendants failed to satisfy their burden of showing material credible evidence that "the chickens ameliorate [L.S.'s] mental condition" and "the proposed accommodation of six chickens kept outside their dwelling was in fact necessary to [L.S.'s] . . . enjoyment of the home."

We also reject defendants' argument that, under our Supreme Court's holding in Players Place II, L.S. has sufficiently shown a factual dispute regarding the necessity to keep all six chickens to "mitigate her PTSD symptoms to the point that she can comfortably live in her home the same as someone without PTSD." The present facts are distinguishable from Players Place II. Relevantly, in Players Place II, the Supreme Court detailed that the homeowner proffered multiple experts who had each observed the homeowner, reviewed the mental health history records and diagnoses, and provided opinions specific to the homeowner's need for the requested ESA. Defendants failed to offer such an expert opinion.

In sum, after a de novo review of the record, we are unpersuaded by defendants' assertion that L.S. "provided sufficient evidence . . . that the chickens ameliorate one or more [disability] symptoms" and are all necessary for her equal opportunity to use and enjoy a dwelling. Therefore, the burden does not shift to plaintiff to demonstrate the accommodation's unreasonableness.

24

A-4057-23

Stated another way, we affirm on the narrow ground that defendants failed to meet their burden of demonstrating under the second element a material issue of fact existed regarding L.S.'s disability-related therapeutic need for the six chickens.

### B. Intentional Infliction of Emotional Distress.

Defendants argue that plaintiff's denial of the requested accommodation was outrageous, and the court erred in finding plaintiff's enforcement of the governing documents does not support a claim. They further contend Lucian's "misleading" statements and the discrimination L.S. has encountered as a disabled person caused her distress, which should be viewed "from the perspective of a disabled person."

To demonstrate a prima facie showing of an intentional infliction of emotional distress, a claimant must show a material issue of fact exists regarding the following elements:

> (1) defendant acted intentionally; (2) defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community"; (3) defendant's actions proximately caused [defendants] emotional distress; and (4) the emotional distress was "so severe that no reasonable [person] could be expected to endure it."

> [Delvalle v. Trino, 474 N.J. Super. 124, 142-43 (App. Div. 2022) (second alteration in original) (quoting Segal v. Lynch, 413 N.J. Super. 171, 191 (App. Div. 2021)).]

A defendant's conduct that supports an intentional infliction of emotional distress claim must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Taylor v. Metzger, 152 N.J. 490, 509 (1998). We have held that the second element is an "elevated threshold" that is satisfied only in extreme cases. Ingraham v. Ortho-McNeil Pharm., 422 N.J. Super. 12, 21 (App. Div. 2011).

Defendants have failed to demonstrate a material issue of fact that plaintiff acted in an outrageous manner in enforcing the Declaration and Bylaws, denying her accommodation, and bringing its lawsuit. As we have concluded, the court appropriately granted plaintiff summary judgment dismissal of defendants' FHA and LAD claims. Thus, defendants have failed to show facts that would permit a rational factfinder to resolve their intentional infliction of emotional distress claim in their favor. See Buckley v. Trenton Saving Fund Soc'y, 111 N.J. 355, 366 (1988).

## C. Declaratory Judgment.

Defendants next argue plaintiff failed to meet the necessary elements to proceed on a declaratory judgment claim and that plaintiff's only enforcement power was to proceed under the governing documents without filing a court action.

Plaintiff permissibly filed a declaratory judgment action because there was a justiciable controversy between adverse parties, and plaintiff had an interest in the suit. Chamber of Commerce v. State, 89 N.J. 131, 140 (1982). "We have appropriately confined [Declaratory Judgment] litigation to those situations where the litigant's concern with the subject matter evidenced a sufficient stake and real adverseness." Indep. Realty Co. v. Township of North Bergen, 376 N.J. Super. 295, 301 (App. Div. 2005) (emphasis in original) (quoting Crescent Park Tenants Ass'n v. Realty Equities Corp., 58 N.J. 98, 107 (1971)). "This strong policy is solidly embedded in our Declaratory Judgment Act, the remedial purpose of which is to afford 'relief from uncertainty and insecurity with respect to rights, status, and other legal relations.'" Ibid. (quoting N.J.S.A. 2A:16-51).

It is undisputed that "[t]he business judgment rule applies 'to common interest communities' such as [plaintiff]." Alloco v. Ocean Beach & Bay Club,

456 N.J. Super. 124, 134 (App. Div. 2018) (quoting Comm. for a Better Twin Rivers v. Twin Rivers Homeowners' Ass'n, 192 N.J. 344, 369 (2007)). "Courts have 'uniformly invoked the business judgment rule in cases involving homeowners' associations[]' because 'a homeowners' association's governing body has "a fiduciary relationship to the unit owners, comparable to the obligation that a board of directors of a corporation owes to its stockholders."'" Alloco, 456 N.J. Super. at 134 (quoting Twin Rivers, 192 N.J. at 369). In the present case, the court correctly determined plaintiff had standing and was authorized to proceed against defendants to enforce the governing documents. We, therefore, reject defendants' contention that plaintiff failed to meet the requirements of an adversarial proceeding.

We are also unpersuaded by defendants' contention that plaintiff was precluded from seeking declaratory judgment because it was "already imbued with the powers to take . . . actions under . . . the [g]overning [d]ocuments." The governing documents do not limit plaintiff's authority to seek enforcement. In fact, the Declaration contemplates filing a court action. Similarly, we find no merit in defendants' argument that the court made no "findings or conclusion of law as to the balancing of the equities" before granting plaintiff summary judgment.

D. Fraud.

Defendants next contend the "[c]ourt incorrectly held that 'there are no facts . . . to establish that there was an intention on the part of Lucian that . . . [d]efendants would rely'" on his statement. They posit that they reasonably relied on their conversation with Lucian two years before they purchased the chickens.

To proceed on a common law fraud claim, a claimant is obligated to establish five elements: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." Walid v. Yolanda for Irene Couture, Inc., 425 N.J. Super. 171, 180 (App. Div. 2012) (quoting Banco Popular N. Am. v. Gandi, 184 N.J. 161, 172-73 (2005)). "Reliance is an essential element of common law fraud." Byrne v. Weichert Realtors, 290 N.J. Super. 126, 137 (App. Div. 1996). Reliance must be actual and justifiable under the circumstances. Walid, 425 N.J. Super. at 181. Consequently, "[w]ithout reasonable reliance on a material misrepresentation, an action in fraud must fail." Triffin v. Automatic Data Processing, Inc., 394 N.J. Super. 237, 249 (App. Div. 2007).

Defendants point to no credible evidence that supports Lucian knowingly made a material misrepresentation that they reasonably relied upon. We note that it is undisputed that the verbal, casual conversation occurred in an informal setting. L.S. did not inquire in writing or memorialize the understanding with the Board. She also candidly acknowledged in her deposition understanding that homeowners' boards have governing documents and that she had previously served on a board. Accepting defendants' assertions as true, we conclude there are no material issues of fact that Lucian's statements were an intended misrepresentation and that defendants relied on the statements.

We similarly discern no merit in defendants' argument that, after they purchased the chickens, they relied on plaintiff's website that indicated "[i]f your immediate neighbors consent in writing to the modification, then the Board will defer to them and approve the application because the Board does not seek to assert its personal preferences over those who are directly benefited and/or impacted by the modification." Notably, the referenced webpage also discussed filing "an application," "appealing an application," the role of the architectural committee in reviewing "applications for exterior home improvements," and that neighbors may notify the Board of violations. The Declaration, which includes the pet limitation and limitation on exterior improvements, also provides under

30

Section 15.06 that it "shall control in the event of any conflict between the terms and conditions set forth in this Declaration and the terms and conditions of the other Governing Documents."  Thus, defendants' alleged reliance on the website after purchasing the chickens and building the coop was not reasonably justified.  For these reasons, summary judgment was appropriately granted on defendants' fraud claim.

E. Malicious Use of Process.

Finally, defendants contend they have demonstrated sufficient facts showing that plaintiff had no reasonable basis to institute the present lawsuit and acted without reasonable "cause because . . . [defendants] requested an accommodation under the FHA and NJLAD."  After a review of the record, we are unpersuaded.

To pursue a malicious use of process claim, a plaintiff must prove:

> (1) a[n] . . . action was instituted by this defendant against this plaintiff; (2) the action was motivated by malice; (3) there was an absence of probable cause to prosecute; . . . (4) the action was terminated favorably to the plaintiff. . . . [and (5)] that the plaintiff has suffered a special grievance caused by the institution of the underlying civil claim.
>
> [Perez v. Zagami, LLC, 443 N.J. Super. 359, 365 (App. Div. 2016) (alterations in original) (citing LoBiondo v. Schwartz, 199 N.J. 62, 90 (2009)).]

31

A-4057-23

The Supreme Court has explained that a special grievance involves "interference with one's liberty or property." Penwag Prop. Co. v. Landau, 76 N.J. 595, 598 (1979); Baglini v. Lauletta, 338 N.J. Super. 282, 300 (App. Div. 2001) (stating a special grievance must be more than the mere cost of defending the lawsuit). Our court has elaborated:

> Examples of such interference or deprivation sufficient to constitute the requisite special grievance are the appointment of a receiver, filing of a petition in bankruptcy, granting of an injunction, issuance of a writ of attachment or writ of replevin, filing of a lis pendens, issuance of an order of arrest, wrongful interference with possession or enjoyment of property, etc.
>
> [Penwag Prop. Co. v. Landau, 148 N.J. Super. 493, 501 (App. Div. 1977), aff'd 76 N.J. at 595.]

Defendants posit there is a question of fact as to whether plaintiff acted with malice because it never "engage[d] in the [required] Interactive Process" or sought to remove another homeowner's chickens. However, defendants do not dispute that plaintiff interacted and attempted to reach a resolution by offering to permit defendants to keep one chicken. "It has been well said that 'it is not unreasonable to require that [the non-moving party responding to a] . . . motion for summary judgment, produce at least some extrinsic evidence of malice.'" Brunson v. Affinity Fed. Credit Union, 199 N.J. 381, 395 (2009) (quoting Westhoff v. Kerr S.S. Co., 219 N.J. Super. 316, 324 (Ap. Div. 1987)).

Defendants' assertion that there was no good faith interactive process is belied by the record.

After reviewing defendants' alleged disputed facts, we discern no material issue supporting a malicious use of process claim. For these reasons, we discern no reason to disturb the court's dismissal of defendants' malicious use of process counterclaim.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division